**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

<table>
<tr><td>

MARYLAND CLEAN ENERGY CENTER, STATE OF ARIZONA, CALIFORNIA PUBLIC UTILITIES COMMISSION, STATE OF COLORADO, STATE OF CONNECTICUT, DISTRICT OF COLUMBIA, STATE OF HAWAIʻI, ILLINOIS FINANCE AUTHORITY, OFFICE OF THE GOVERNOR *EX REL*. ANDY BESHEAR, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, NEVADA CLEAN ENERGY FUND, STATE OF NEW JERSEY, STATE OF NEW MEXICO, NEW YORK STATE ENERGY RESEARCH AND DEVELOPMENT AUTHORITY, STATE OF NORTH CAROLINA, STATE OF OREGON, PENNSYLVANIA ENERGY DEVELOPMENT AUTHORITY, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, WISCONSIN ECONOMIC DEVELOPMENT CORPORATION,

        Plaintiffs,

   v.

VIRGINIA DEPARTMENT OF ENERGY,

        Consolidated Plaintiff,
   v.

UNITED STATES OF AMERICA,

        Defendant.

</td><td>

Civ. No. 25-cv-01738
(Consolidated with No. 26-268)

(Senior Judge Smith)

</td></tr>
</table>

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ii

QUESTION PRESENTED ............................................................................................... 1

INTRODUCTION............................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 3

    A.    Congress Creates the Greenhouse Gas Reduction Fund ................................. 3

    B.    The EPA Launches the Solar For All Grant Program...................................... 4

    C.    Plaintiffs and the EPA Execute Solar for All Grant Agreements.................... 4

    D.    The EPA Approves Plaintiffs' Workplans and Issues Amended Grant Agreements....... 8

    E.    Congress Repeals Clean Air Act § 134 and Rescinds Unobligated Funds................... 12

    F.    The EPA Unilaterally Terminates Plaintiffs' Solar for All Grant Agreements and Drains Nearly All the Money from Plaintiffs' Spending Accounts........................................ 13

    G.    Plaintiffs File Notices of Disagreement and the EPA Renders Them Moot................. 16

    H.    The EPA Pursues Closeout Procedures ........................................................ 17

PROCEDURAL BACKGROUND ................................................................................. 17

ARGUMENT ................................................................................................................. 18

I.    Legal Standard................................................................................................ 18

II.    This Court Has Jurisdiction............................................................................ 19

III.    Plaintiffs Are Entitled to Summary Judgment on Count I for Breach of Contract ...... 22

    A.    The Solar for All Grant Agreements Constitute Valid Government Contracts Between Each Plaintiff and the EPA ........................................................................ 22

    B.    The EPA Had an Obligation Under Each Solar for All Grant Agreement to Provide Money to Each Plaintiff........................................................................................ 27

    C.    The EPA Breached Its Obligations by Improperly Terminating the Solar for All Grant Agreements and Repudiating Its Future Duty to Pay................................................ 29

        *i.*    *The EPA Breached the Solar for All Grant Agreements by Unilaterally Terminating Them Without Complying with the Termination Provision*...... 30

        *ii.*    *The EPA Repudiated Its Future Obligations to Perform Under the Solar for All Grant Agreements*................................................................ 31

        *iii.*    *The EPA's Purported Justifications Do Not Withstand Scrutiny*..............32

    D.    The EPA's Breach Caused Plaintiffs to Suffer Damages............................................ 39

CONCLUSION ............................................................................................................. 40

## TABLE OF AUTHORITIES

### Cases

*Amber Res. Co. v. United States*, 68 Fed. Cl. 535 (2005) ................................................................ 43

*Anderson v. United States*, 23 F.4th 1357 (Fed. Cir. 2022) ............................................................ 20

*Anderson v. United States*, 344 F.3d 1343 (Fed. Cir. 2003) .......................................................... 25

*Arizona v. U.S. EPA*, No. 2:25-cv-02015 (W.D. Wash. Oct. 16, 2025) ........................................ 18

*Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597 (2014) ................................................... 22

*Boaz Hous. Auth. v. United States*, 994 F.3d 1359 (Fed. Cir. 2021) ............................................ 20

*Boaz Hous. Auth.*, 994 F.3d 1359 (Fed. Cir. 2021) .................................................................. 21, 22

*Boyd v. United States*, 134 F.4th 1348 (Fed. Cir. 2025) ............................................................... 25

*Cardiosom, L.L.C. v. United States*, 117 Fed. Cl. 526 (2014) ...................................................... 42

*Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005) ................................................... 43

*Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90 (D.D.C. 2025) ................................. 40

*Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330 (Fed. Cir. 2021) ....... 22, 25, 26, 27, 28, 30

*Cosmo Constr. Co. v. United States*, 451 F.2d 602 (Ct. Cl. 1971) ........................................... 1, 44

*Doe v. United States*, 153 Fed. Cl. 629 (2021) ...................................................... 22, 33, 35, 36

*First Nationwide Bank v. United States*, 431 F.3d 1342 (Fed. Cir. 2005) ........................ 37, 42, 43

*Franconia Assocs. v. United States*, 536 U.S. 129 (2002) ....................................................... 23, 33

*Gould, Inc. v. United States*, 935 F.2d 1271 (Fed. Cir. 1991) ...................................................... 31

*Greene v. United States*, 100 F.4th 1364 (Fed. Cir. 2024) ........................................................... 21

*Harlem Globetrotters Int'l, Inc. v. United States*, 168 Fed. Cl. 31 (2023) .................................. 22

*Harris County v. U.S. EPA*, No. 1:25-cv-03646 (D.D.C.) ............................................................ 19

*Holmes v. United States*, 657 F.3d 1303 (Fed. Cir. 2011) ............................................................ 21

*Hometown Fin. v. United States*, 409 F.3d 1360 (Fed. Cir. 2005) ............................................... 26

*Hometown Fin. v. United States*, 53 Fed. Cl. 326 (2002) ............................................................ 45

*Hous. Auth Slidell v. United States*, 149 Fed. Cl. 614 (Fed. Cl. 2020) ........................................ 32

*J. D. Hedin Const. Co. v. United States*, 408 F.2d 424 (Ct. Cl. 1969) ........................................... 35

*Laborant, LLC v. United States*, 180 Fed. Cl. 76 (2026) ...................................................... 29, 30

*Martinez v. United States*, 333 F.3d 1295 (Fed. Cir. 2003) ........................................................ 23

*Massie v. U.S. Dep't of Hous. & Urban Dev't*, 620 F.3d 340 (3d Cir. 2010) ............................... 23

*McCarthy v. Madigan*, 503 U.S. 140 (1992) ............................................................................... 24

*Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624 (S.D.N.Y. 2025) ......................................... 40

*Nicholson v. United States*, 29 Fed. Cl. 180 (1993) .................................................................... 41

*NIH v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025) .................................................... 19

*Northrop Grumman Computing Sys. v. United States*, 93 Fed. Cl. 144 (2010) ........................... 20

*Ohio v. United States*, 154 Fed. Cl. 233 (2021) .......................................................................... 31

*Oliva v. United States*, 961 F.3d 1359 (Fed. Cir. 2020) ......................................................... 24, 44

*Pacito v. Trump*, No. 25-1313, 2026 WL 620449 (9th Cir. Mar. 5, 2026) ................................... 22

*Paul Hardeman, Inc. v. United States*, 406 F.2d 1357 (Ct. Cl. 1969) ......................................... 45

*R.I. AFL-CIO v. U.S. EPA*, No. 25-cv-00510 (D.R.I.) .................................................................. 19

*Ridge Runner Forestry v. Veneman*, 287 F.3d 1058 (Fed. Cir. 2002) ......................................... 27

*Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320 (Fed. Cir. 2016) ........................ 21

*Rollock Co. v. United States*, 115 Fed. Cl. 317 (2014) ................................................................ 23

*S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319 (Fed. Cir. 2005) ....................... 44

*San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957 (Fed. Cir. 1989) ...................... 31

*San Juan City Coll. v. United States*, 391 F.3d 1357 (Fed. Cir. 2004) .......................................... 1

*Sanders v. United States*, 252 F.3d 1329 (Fed. Cir. 2001) .......................................................... 21

*Stockton E. Water Dist. v. United States*, 583 F.3d 1344 (Fed. Cir. 2009) ................................... 43

*Suess v. United States*, 535 F.3d 1348 (Fed. Cir. 2008) .............................................................. 31

*Sys. Fuels v. United States*, 66 Fed. Cl. 722 (2005) .................................................................... 44

iii

*Thermalon Industries v. United States*, 34 Fed. Cl. 411 (1995)................................................27, 29

*TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336 (2013) ......................................................... 35

*Trans Ocean Van Serv. v. United States*, 426 F.2d 329 (Ct. Cl. 1970) ........................................ 45

*Trauma Serv. Grp. v. United States*, 104 F.3d 1321 (Fed. Cir. 1997) ......................................... 25

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ............................................................ 21, 42

*Virginia Dep't Energy v. USA*, No. 26-cv-00268 (Fed. Cl. Feb. 17, 2026). ................................ 19

*Winstar Corp. v. United States*, 64 F.3d 1531 (Fed. Cir. 1995) .................................................... 33

## Other Authorities

171 Cong. Rec. S4283 (July 9, 2025) ........................................................................................ 12

2 C.F.R § 200.340(a)(4) .............................................................................................................. 35

2 C.F.R. § 1500.15 .............................................................................................................. 16, 21

2 C.F.R. § 1500.17 ...................................................................................................................... 16

2 C.F.R. § 200.340(a) .................................................................................................................. 34

2 C.F.R. §§ 200.339–.340 ............................................................................................................. 2

28 U.S.C. § 1491(a)(1).................................................................................................................. 19

28 U.S.C. § 2412........................................................................................................................... 18

5 U.S.C. § 706............................................................................................................................... 17

89 Fed. Reg. 30,046 (April 22, 2024)................................................................................... 34, 35

Pub. L. 117-59, § 60103, 136 Stat. 2066 (2022)......................................................................... 25

Pub. L. 119- 21, 139 Stat. 72 (July 4, 2025) ............................................................................... 12

Pub. L. No. 119–4, § 1802(3), 139 Stat. 9, 30 (2025).................................................................. 13

Pub. Law 117-169, § 60103, 136 Stat. 1818, 2065–66 (Aug. 16, 2022) .................................. 1, 3

## Miscellaneous Authorities

A. Corbin, *Contracts* § 959 (1951) .............................................................................................. 31

*Automated Standard Application for Payments*, U.S. Dep't of Treasury, Bureau of Fiscal Servs.,
    https://perma.cc/M3RZ-9SMB.............................................................................................. 12

*Grismore on Contracts* § 105 ........................................................................................... 39

*Information on Receiving Grant/Cooperative Agreement Payments*, U.S. Env't Prot. Agency,
https://perma.cc/32X8-C6YL ................................................................................ 12

Our Mission and What We Do, U.S. EPA, https://perma.cc/T29F-752N ................................... 28

Restatement (Second) of Contracts § 18 (1981) ........................................................... 25

Restatement (Second) of Contracts § 71(1) .................................................................. 26

U.N. Framework Convention on Climate Change (UNFCCC), The United States of America—
Nationally Determined Contribution (Dec. 2024), https://tinyurl.com/228ttnex ...................... 28

U.S. EPA, EPA-190R24002, Fiscal Year 2025: Justification of Appropriation Estimates for the
Committee on Appropriations (Mar. 2024), https://perma.cc/63FY-ZL8L .............................. 28

U.S. EPA, *Fiscal Year 2025 Justification of Appropriation Estimates for the Committee on
Appropriations, Tab 05: Environmental Programs and Management*, 5, 40 (March 2024),
https://perma.cc/SU9G-69GU ................................................................................ 14

U.S. EPA, News Release, *Biden-Harris Administration Announces $7 Billion Solar for All
Grants to Deliver Residential Solar, Saving Low-Income Americans $350 Million Annually
and Advancing Environmental Justice Across America* (April 22, 2024),
https://perma.cc/48ZG-CDMS ................................................................................ 5

UNFCCC, The United States of America—Nationally Determined Contribution (Apr. 2021),
https://tinyurl.com/228ttnex .................................................................................. 28

**QUESTION PRESENTED**

Whether Defendant the United States breached the Plaintiffs' Solar for All Grant Agreements by unilaterally terminating them without grounds to do so under the clear terms and conditions of the Grant Agreements?

**INTRODUCTION**

Plaintiffs and Consolidated Plaintiff are a group of States, State agencies, quasi-State instrumentalities, and the District of Columbia (collectively, "Plaintiffs") who filed suit to recover monetary damages caused by the U.S. Environmental Protection Agency ("EPA") breach of contract.  Pursuant to Court of Federal Claims Rule 56 ("RCFC"), Plaintiffs respectfully move for partial summary judgment for breach of contract under Count I of their Complaint.[1]

Beginning in 2024, the EPA entered into binding contracts with Plaintiffs to implement Solar for All, a $7 billion program created by Congress "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities."  Pub. Law 117-169, § 60103, 136 Stat. 1818, 2065–66 (Aug. 16, 2022).  The contracts at issue were a Grant Agreement and subsequent Assistance Amendment (collectively, the "Solar for All Grant Agreements").  Under the express terms of the Solar for All Grant Agreements, each Plaintiff agreed to administer the Solar for All program within their respective state in accordance with an approved Solar for All workplan, consistent with the EPA and Congress's goals, and to comply with their obligations under the Solar for All Grant Agreements.  In exchange, the EPA had a contractual duty to provide money to each Plaintiff.

---

[1]  Plaintiffs have moved for summary judgment on liability only and intend to present their evidence on damages at a future time.  *See e.g.*, *San Juan City Coll. v. United States*, 391 F.3d 1357, 1365 (Fed. Cir. 2004); *Cosmo Constr. Co. v. United States*, 451 F.2d 602, 605 (Ct. Cl. 1971).

Critically, all parties agreed that the EPA did not have an unfettered right to unilaterally terminate the Solar for All Grant Agreements. Rather, the Solar for All Grant Agreements explicitly limited the EPA's right to terminate to only three grounds: (1) substantial noncompliance with the terms and conditions of the Solar for All Grant Agreements that materially affects performance; (2) adequate evidence of waste, fraud, or abuse; or (3) a material misrepresentation of eligibility status.

For a year, all parties performed under the Solar for All Grant Agreements. In August 2025, however, the EPA abruptly changed course. First, it sent a letter to each Plaintiff stating that it was terminating the Solar for All program and all existing grants. Then, it followed up by purporting to unilaterally terminate each Solar for All Grant Agreement and restrict Plaintiffs from accessing their full awards. Finally, it withdrew upwards of 93 percent of award money from each Plaintiff's spending account and attempted to initiate close-out procedures. These actions constitute a clear breach of the EPA's obligations under the Solar for All Grant Agreements and an anticipatory repudiation of the EPA's promise to pay money in the future.

In taking these actions, the EPA has never invoked its right to unilateral termination under the express terms of the Solar for All Grant Agreements. Nor could it, as the EPA has not demonstrated (and cannot demonstrate) that any of the conditions necessary to invoke that provision were satisfied. Instead, the EPA claimed a right to terminate via three other avenues: (1) an unspecified "Termination General Term and Condition of this agreement," (2) a general reference to the regulations that govern federal grantmaking, *see* 2 C.F.R. §§ 200.339–.340, and (3) a change in federal law, *see* One Big Beautiful Bill Act, Pub. L. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025) ("H.R. 1"). None of these explanations withstand scrutiny, and this Court should decline the EPA's invitation to skirt liability by rewriting its contractual obligations.

First, the terms and conditions of the Solar for All Grant Agreements plainly do not support termination, and the EPA cannot unilaterally supplant those terms without Plaintiffs' agreement. Second, the pertinent regulations do not expand a party's right to terminate for mere policy differences, as the EPA seems to suggest, but instead underscore the basic principle that a federal agency "must clearly and unambiguously specify all termination provisions" in the contract's terms and conditions. Here, the Solar for All Grant Agreements clearly and unambiguously specified the grounds for termination (which were not met), and the EPA cannot retroactively impose new, alternative grounds for termination. Finally, the change in law has no bearing on the EPA's liability for damages. Even if Congress had intended to retroactively abrogate contract provisions through new legislation (which Plaintiffs dispute), the government would still be liable for damages for this breach.

Accordingly, the EPA breached the Solar for All Grant Agreements, and summary judgment should be entered in favor of Plaintiffs on liability under Count I as a matter of law.

## **FACTUAL BACKGROUND**

### **A. Congress Creates the Greenhouse Gas Reduction Fund**

In 2022, Congress created a $27 billion Greenhouse Gas Reduction Fund by adding Section 134 to the Clean Air Act. Pub. Law 117-169, § 60103, 136 Stat. 1818, 2065–66 (Aug. 16, 2022), *codified as* 42 U.S.C. § 7434, *repealed by* Pub. L. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025). As part of the Greenhouse Gas Reduction Fund, Congress appropriated $7 billion for the EPA to use to support "zero-emission technologies." 136 Stat. at 2066. Specifically, Congress directed the EPA "to make grants, on a competitive basis . . . to States" and other "eligible recipients, which would be used for "providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or

3

benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." *Id*.

Congress appropriated this $7 billion for fiscal year 2022, directed the EPA to begin making grants "not later than 180 calendar days after August 16, 2022," and provided that the appropriated funds would "remain available until September 30, 2024." *Id*. Congress also appropriated $30 million to the EPA—"[i]n addition to amounts otherwise available"—for the "administrative costs necessary to carry out activities under" the Greenhouse Gas Reduction Fund, to be available until September 30, 2031. *Id*.

### B. The EPA Launches the Solar For All Grant Program

On June 28, 2023, the EPA published a Notice of Funding Opportunity ("NOFO") for the zero-emissions technology competitive grant program—called "Solar for All"—and issued a revised NOFO shortly thereafter. *See* Ex. A to Compl., ECF 1-3. The NOFO required applicants to provide specific and detailed information, including a program narrative, a program administrative narrative, and a reporting plan. *Id*. at 44–49.

On April 22, 2024, the EPA announced its selection of 60 Solar for All grant recipients, including "states, territories, Tribal governments, municipalities, and nonprofits." U.S. EPA, News Release, *Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low-Income Americans $350 Million Annually and Advancing Environmental Justice Across America* (April 22, 2024), https://perma.cc/48ZG-CDMS. Plaintiffs were among the Solar for All grant recipients. *Id.*

### C. Plaintiffs and the EPA Execute Solar for All Grant Agreements

By August 16, 2024, the EPA entered into Grant Agreements with each Plaintiff (the "Initial Grant Agreements"). *See* Exs. C1–C24 to Compl., ECF 1-5; *see also* Ex. C to Compl., *Virginia*

*Dep't Energy v. USA*, No. 26-cv-00268, ECF 1-4 [hereinafter, "Consolidated Compl.]; *see also* Kearns Decl. Ex. 1 (R.I.), ECF 72-21.[2]  The Initial Grant Agreements contained the same terms and conditions, differing only with respect to the details of the recipient, such as the recipient's name, award amount, program name, grant number, and individual signatories.  *See id.*; *see also* ECF 52-2, at 3 (Defs.' Opp'n Prelim. Inj. in *Arizona v. EPA et al.*) (acknowledging the "EPA awarded each grant under materially identical terms.").  Each Initial Grant Agreement was signed by an authorized EPA award official on behalf of the United States and became binding on both parties by the recipient either "drawing down funds within 21 days after the EPA award or amendment mailing date" or "not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date."  Exs. C1–C24 to Compl., ECF 1-5, at 2 (Md.), 41 (Ariz.), 80 (Cal.),[3] 119 (Colo.), 159 (Conn.), 198 (D.C.), 236 (Haw.), 275 (Ill.), 314 (Ky.), 352 (Me.), 391 (Mass.), 430 (Mich.), 469 (Minn.), 508 (Nev.), 547 (N.J.), 586 (N.M.), 626 (N.Y.), 665 (N.C.), 703 (Or.), 742 (Pa.), 785 (Vt.), 824 (Wash.), 863 (Wis.); *see also* Ex. C to Consolidated Compl., ECF 1-4, at 2 (Va.); *see also* Kearns Decl. Ex. 1 at 1 (R.I.).

None of the Plaintiffs filed a notice of disagreement.  *See* Magruder Decl. ¶ 8 (Md.); Mahoney Decl. ¶ 7 (Ariz.); Tesfai Decl. ¶ 14 (Cal.); Gomez Decl. ¶ 10 (Colo.); Dykes Decl. ¶ 8 (Conn.); Burger Decl. ¶ 7 (D.C.); Lau Decl. ¶ 9 (Haw.); Granda Decl. ¶ 11 (Ill.); Lyons Decl. ¶ 8

---

[2] For the State of Rhode Island, the Initial Grant Agreement attached to the Complaint at Ex. C, ECF 1-5, at 78–81, did not contain the entirety of the document.  A full and correct copy is reattached as Exhibit 1 to the Kearns Declaration, ECF 72-21.

[3] For California, the initial Solar for All grantee was the California Energy Commission (CEC).  *See* Ex. C3, ECF 1-5, at 80.  In September 2024, CEC requested to transfer its role as prime grantee to Plaintiff California Public Utilities Commission (CPUC).  EPA then issued an Assistance Amendment designating CPUC as the Grant Recipient.  *See* Ex. E3, ECF 1-7, at 95–141 (CPUC Amended Grant Agreement I).  The EPA subsequently mailed a separate Grant Agreement with a new grant number to CPUC on January 22, 2025.  *See* Ex. E4, ECF 1-7, at 142–89 (CPUC Amended Grant Agreement II).  *See also* Tesfai Decl. (Cal.) ¶¶ 6–15, ECF 72-3.

(Ky.); Cunningham Decl. ¶ 8 (Me.); Mahony Decl. ¶ 8 (Mass.); Wang Decl. ¶ 8 (Mich.); Pawlisch Decl. ¶ 8 (Minn.); Stasio Decl. ¶ 6 ( Nev.); Oomen Decl. ¶ 8 (N.J.); Stair Decl. ¶ 8 (N.M.); Poisson Decl. ¶ 7 (N.Y.); Woosely Decl. ¶ 8 (N.C.); Benner Decl. ¶ 9 (Or.); Shirley Decl. ¶ 11 (Pa.); Kearns Decl. ¶ 8 (R.I.); Bailey Decl. ¶ 8 (Vt.); Clifthorne Decl. ¶ 8 (Wash.); Rikkers Decl. ¶ 8 (Wis.); Maiden Decl. ¶ 8 (Va.).  Thus, each Initial Grant Agreement became binding no later than 21 days after each agreement's mailing date.  *See, e.g.*, Ex. C1 to Compl., ECF 1-5, at 2 (MCEC Initial Grant Agreement, mailed on July 17, 2024 and binding no later than August 7, 2024).

Under each Initial Grant Agreement, the EPA awarded each Plaintiff between $48.93 million and $249.4 million in federal funding to carry out its Solar for All program.  Exs. C1–C24 to Compl., ECF 1-5, at 2 (Md.), 41 (Ariz.), 80 (Cal.), 119 (Colo.), 159 (Conn.), 198 (D.C.), 236 (Haw.), 314 (Ky.), 352 (Me.), 391 (Mass.), 469 (Ill.), 508 (Nev.), 547 (N.J.), 586 (N.M.), 626 (N.Y.), 665 (N.C.), 703 (Or.), 742 (Pa.), 785 (Vt.), 824 (Wash.), 863 (Wis.); *see also* Ex. C to Consolidated Compl., ECF 1-4, at 2 (Va.); *see also* Kearns Decl. Ex. 1 at 1 (R.I.).  In exchange, each Plaintiff agreed to comply with an array of requirements.  For example, each Plaintiff agreed to, among other things, "implement this grant in accordance with its EPA-approved Solar for All Workplan"; "only use the award to support . . . allowable activities" and "not use the award for . . . unallowable activities"; and "ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies."  Exs. C1–C24 to Compl., ECF 1-5, at 18–19 (Md.), 57–58 (Ariz.), 96–97 (Cal.), 135–37 (Colo.), 175–77 (Conn.), 213–14 (D.C.), 252–53 (Haw.), 291–92 (Ill.), 329–30 (Ky.), 368–70 (Me.), 407–09 (Mass.), 446–47 (Mich.), 485–86 (Minn.), 524–25 (Nev.), 563–64 (N.J.), 602–04 (N.M.), 642–43 (N.Y.), 680–81 (N.C.), 719–21 (Or.), 758–59 (Pa.), 801–03 (Vt.), 840–42

6

(Wash.), 879–80 (Wis.); *see also* Ex. C to Consolidated Compl., ECF 1-4, at 18–19 (Va.); *see also* Kearns Decl. Ex. 1 at 16–17 (R.I.).

The Initial Grant Agreements also anticipated that recipients would work with the EPA to finalize program workplans and budgets before implementing their programs and funding projects in early 2025. Thus, the Initial Grant Agreements limited Plaintiffs to drawing down "no more than 2%" of their total awards and restricted the cost categories for which funds could be drawn. Exs. C1–C24 to Compl., ECF 1-5, at 17 (Md.), 56 (Ariz.), 95 (Cal.), 134 (Colo.), 174 (Conn.), 212 (D.C.), 251 (Haw.), 290 (Ill.), 328 (Ky.), 367 (Me.), 406 (Mass.), 445 (Mich.), 484 (Minn.), 523 (Nev.), 562 (N.J.), 601 (N.M.), 641 (N.Y.), 679 (N.C.), 718 (Or.), 757 (Pa.), 800 (Vt.), 839 (Wash.), 878 (Wis.); *see also* Ex. C to Consolidated Compl., ECF 1-4, at 17 (Va.); *see also* Kearns Decl. Ex. 1 at 15 (R.I.). This restriction would last until the Plaintiffs submitted additional documentation, after which the EPA would "review the recipient's submissions and [] work with the recipient . . . to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task." *Id.* "Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition." *Id.*

And, each Initial Grant Agreement contained an identical termination provision:

> EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount,

7

> based on the deobligation.  In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

Exs. C1–C24 to Compl., ECF 1-5, at 31 (Md.), 70 (Ariz.), 109 (Cal.), 149 (Colo.), 188 (Conn.), 226 (D.C.), 265 (Haw.), 304 (Ill.), 342 (Ky.), 381 (Me.), 420 (Mass.), 459 (Mich.), 498 (Minn.), 537 (Nev.), 576 (N.J.), 615 (N.M.), 655 (N.Y.), 693 (N.C.), 732 (Or.), 771 (Pa.), 814 (Vt.), 853 (Wash.), 878 (Wis.); *see also* Ex. C to Consolidated Compl., ECF 1-4, at 31 (Va.); *see also* Kearns Decl. Ex. 1 at 29 (R.I.).

### D.  The EPA Approves Plaintiffs' Workplans and Issues Amended Grant Agreements

Over the following months, each Plaintiff submitted—and the EPA approved—final Solar for All workplans.  *See* Exs. D1–D24 to Compl., ECF 1-6; *see also* Ex. D to Consolidated Compl., ECF 1-5 (Va.).[4]  Starting in December 2024, the EPA issued Assistance Amendments (the "Amended Grant Agreements") lifting the 2% funding restriction and agreed "to cost-share 100% of all approved budget period costs incurred" by each Plaintiff, "up to and not exceeding total federal funding" of each Grant Award.  Exs. E1–E25 to Compl., ECF 1-7, at 2 (Md.), 49 (Ariz.), 143 (Cal.), 191 (Colo.), 238 (Conn.), 285 (D.C.), 332 (Haw.), 379 (Ill.), 412 (Ky.), 459 (Me.), 506 (Mass.), 552 (Mich.), 585 (Minn.), 617 (Nev.), 664 (N.J.), 711 (N.M.), 758 (N.Y.), 805 (N.C.), 852 (Or.), 899 (Pa.), 946 (R.I.), 993 (Vt.), 1040 (Wash.), 1087 (Wis.); *see also* Ex. E to Consolidated Compl., ECF 1-6, at 2.  The Amended Grant Agreements were again materially identical.  *See id.*

Like the Initial Grant Agreements, each Plaintiff's Amended Grant Agreement was signed by an authorized EPA award official on behalf of the United States and became binding on both

---

[4] The workplan for Plaintiff California Public Utilities Commission attached as Exhibit D to the Complaint, ECF 1–6, at pages 82-161, contained errors due to technical issues in uploading the document to the CM/ECF system.  A true and accurate copy is reattached to the Tesfai Declaration (Cal.), ECF 72-3. The workplan for the State of Rhode Island was subsequently revised, and a true and accurate copy of that workplan is attached as Exhibit 2 to the Kearns Declaration (R.I.), ECF 72-21.

parties by the recipient either "drawing down funds within 21 days after the EPA award or amendment mailing date" or "not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date." Exs. E1–E25 to Compl., ECF 1-7, at 2 (Md.), 49 (Ariz.), 143 (Cal.), 191 (Colo.), 238 (Conn.), 285 (D.C.), 332 (Haw.), 379 (Ill.), 412 (Ky.), 459 (Me.), 506 (Mass.), 552 (Mich.), 585 (Minn.), 617 (Nev.), 664 (N.J.), 711 (N.M.), 758 (N.Y.), 805 (N.C.), 852 (Or.), 899 (Pa.), 946 (R.I.), 993 (Vt.), 1040 (Wash.), 1087 (Wis.); *see also* Ex. E to Consolidated Compl., ECF 1-6, at 2 (Va.).

Also like the Initial Grant Agreements, the Amended Grant Agreements awarded each Plaintiff a sum of money in exchange for a promise to, among other things, "implement this grant in accordance with its EPA-approved Solar for All Workplan"; "only use the award to support . . . allowable activities" and "not use the award for . . . unallowable activities"; and "ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies." Exs. E1–E25 to Compl., ECF 1-7, at 23–24 (Md.), 70–71 (Ariz.), 165–66 (Cal.), 212–13 (Colo.), 259–60 (Conn.), 306–07 (D.C.), 353–54 (Haw.), 394–95 (Ill.), 433–34 (Ky.), 480–81 (Me.), 526–27 (Mass.), 567–68 (Mich.), 599–600 (Minn.), 638–69 (Nev.), 685–86 (N.J.), 732–33 (N.M.), 779–80 (N.Y.), 826–27 (N.C.), 873–74 (Or.), 920–21 (Pa.), 967–68 (R.I.), 1014–15 (Vt.), 1061–62 (Wash.), 1102–03 (Wis.); *see also* Ex. E to Consolidated Compl., ECF 1-6, at 23–24 (Va.).

Further, the Amended Grant Agreements contained an amended termination provision which was revised to (1) incorporate by reference October 1, 2024 amendments to 2 C.F.R. § 200.340, (2) add "material misrepresentation of eligibility status" as a ground for termination, and (3) add the EPA's agreement to "re-obligate [funds] to another Eligible Recipient" if it partially

9

or completely terminates an award.  The amended termination provision was identical in each Amended Grant Agreement:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation.  In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

Exs. E1–E25 to Compl., ECF 1-7, at 38 (Md.), 84 (Ariz.), 179 (Cal.), 226 (Colo.), 273 (Conn.), 320 (D.C.), 367 (Haw.), 404 (Ill.), 448 (Ky.), 494 (Me.), 540 (Mass.), 577 (Mich.), 609 (Minn.), 652 (Nev.), 699 (N.J.), 746 (N.M.), 793 (N.Y.), 841 (N.C.), 887 (Or.), 934 (Pa.), 981 (R.I.), 1028–29 (Vt.), 1075 (Wash.), 1112 (Wis.); *see also* Ex. E to Consolidated Compl., ECF 1-6, at 37–38 (Va.).  The Amended Grant Agreements also provided that the "EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208."  Exs. E1–E25 to Compl., ECF 1-7, at 36 (Md.), 83 (Ariz.), 178 (Cal.); 225 (Colo.), 272 (Conn.), 319 (D.C.), 366 (Haw.), 403 (Ill.), 446 (Ky.), 493 (Me.), 539 (Mass.), 576 (Mich.), 608 (Minn.), 651 (Nev.), 698 (N.J.), 745

(N.M.), 792 (N.Y.), 839 (N.C.), 886 (Or.), 933 (Pa.), 980 (R.I.), 1027 (Vt.), 1074 (Wash.), 1111 (Wis.); *see also* Ex. E to Consolidated Compl., ECF 1-6, at 36 (Va.).

On January 22, 2025, the EPA mailed its last Amended Grant Agreement to Plaintiff California Public Utilities Commission, which substituted a revised grant number. *See* Ex. E4 to Compl. ECF 1-7, at 143 (CPUC Amended Grant Agreement II, Jan 22, 2025). None of the Plaintiffs filed a notice of disagreement. *See* Magruder Decl. ¶ 12 (Md.); Mahoney Decl. ¶ 11 (Ariz.); Tesfai Decl. ¶ 16 (Cal.); Gomez Decl. ¶ 14 (Colo.); Dykes Decl. ¶ 12 (Conn.); Burger Decl. ¶ 11 (D.C.); Lau Decl. ¶ 13 (Haw.); Granda Decl. ¶ 15 (Ill.); Lyons Decl. ¶ 12 (Ky.); Cunningham Decl. ¶ 12 (Me.); Mahony Decl. ¶ 12 (Mass.); Wang Decl. ¶ 12 (Mich.); Pawlisch Decl. ¶ 12 (Minn.); Stasio Decl. ¶ 10 ( Nev.); Oomen Decl. ¶ 12 (N.J.); Stair Decl. ¶ 12 (N.M.); Poisson Decl. ¶ 11 (N.Y.); Woosely Decl. ¶ 12 (N.C.); Benner Decl. ¶ 13 (Or.); Shirley Decl. ¶ 15 (Pa.); Kearns Decl. ¶ 12 (R.I.); Bailey Decl. ¶ 12 (Vt.); Clifthorne Decl. ¶ 12 (Wash.); Rikkers Decl. ¶ 12 (Wis.); Maiden Decl. ¶ 12 (Va.). Thus, each Amended Grant Agreement became binding no later than February 6, 2025. These Amended Grant Agreements, together with the Initial Grant Agreements, constitute the Solar for All Grant Agreements that were binding on both parties.

At this point, each Plaintiff had full access to their Solar for All award that the EPA had deposited into each of their Automated Standard Application for Payments ("ASAP") account.[5] Exs. F1–F24, ECF 1-8, at 2 (Md.), 5 (Ariz.), 7 (Cal.), 9 (Colo.), 11 (Conn.), 13 (D.C.), 15 (Haw.), 17 (Ill.), 19 (Ky.), 21 (Me.), 23 (Mass.), 25 (Mich.), 27 (Minn.), 29 (Nev.), 33 (N.J.), 35 (N.M.),

---

[5] ASAP is an electronic system that federal agencies use to transfer money to recipient organizations. *See Automated Standard Application for Payments*, U.S. Dep't of Treasury, Bureau of Fiscal Servs., https://perma.cc/M3RZ-9SMB (last visited Dec. 12, 2025). Federal agencies enroll recipients and authorize their payments, and recipients can request payments from these pre-authorized accounts. *Id.* ASAP is the mandatory method of payment for EPA grantees. *See Information on Receiving Grant/Cooperative Agreement Payments*, U.S. Env't Prot. Agency, https://perma.cc/32X8-C6YL (last visited Dec. 12, 2025).

37 (N.Y.), 39 (N.C.), 41 (Or.), 43 (Pa.), 47 (R.I.), 49 (Vt.), 51 (Wash.), 54 (Wis.); *see also* Ex. F to Consolidated Compl., ECF 1-7, at 2 (Va.). Over the next several months, Plaintiffs performed their duties under the Solar for All Grant Agreements, and some Plaintiffs began requesting reimbursements for approved Solar for All expenses, which the EPA approved. *See* Magruder Decl. ¶ 13 (Md.); Mahoney Decl. ¶ 12 (Ariz.); Tesfai Decl. ¶ 17 (Cal.); Gomez Decl. ¶ 15 (Colo.); Dykes Decl. ¶ 13 (Conn.); Burger Decl. ¶ 12 (D.C.); Lau Decl. ¶ 14 (Haw.); Granda Decl. ¶ 16 (Ill.); Lyons Decl. ¶ 13 (Ky.); Cunningham Decl. ¶ 13 (Me.); Mahony Decl. ¶ 13 (Mass.); Wang Decl. ¶ 13 (Mich.); Pawlisch Decl. ¶ 13 (Minn.); Stasio Decl. ¶ 11 ( Nev.); Oomen Decl. ¶ 13 (N.J.); Stair Decl. ¶ 13 (N.M.); Poisson Decl. ¶ 12 (N.Y.); Woosely Decl. ¶ 13 (N.C.); Benner Decl. ¶ 14 (Or.); Kearns Decl. ¶ 13 (R.I.); Bailey Decl. ¶ 13 (Vt.); Clifthorne Decl. ¶ 13 (Wash.); Rikkers Decl. ¶ 13 (Wis.); Maiden Decl. ¶ 13 (Va.).

### E.  Congress Repeals Clean Air Act § 134 and Rescinds Unobligated Funds

On July 3, 2025, Congress passed a budget reconciliation bill ("H.R. 1"), and the President signed it into law the next day. *See* Pub. L. 119- 21, 139 Stat. 72 (July 4, 2025). Section 60002 of H.R. 1 provides: "Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the *unobligated* balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded." 139 Stat. at 154 (emphasis added).

Under the statute's plain text, H.R. 1 did not rescind obligated funds but rescinded only "the *unobligated* balances" made available to carry out the Solar for All program. *See id.* (emphasis added). Legislative materials also confirm that H.R. 1 implicates only funds that were not already obligated. *See* 171 Cong. Rec. S4283 (July 9, 2025) (testimony from Representative Brett Guthrie (R-KY)) (noting H.R. 1 "does not close the grants on any obligated funds"); *id.* at S4282–83 (testimony from Representative Morgan Griffith (R-VA)) (explaining that "[i]f the grant

12

has already been granted and the money is obligated, then our language does not affect that"); *id*. at S4282–83 (statement from Senator Sheldon Whitehouse (D-RI)) (noting majority view "made clear that rescissions from environmental grant programs only touched funding that had not yet gone out the door"). Plaintiffs' Solar for All funds were all obligated months before the enactment of H.R. 1 and, therefore, were not rescinded by H.R. 1. *See* Answer, ECF 66, ¶¶ 4, 74, (admitting that the EPA had obligated the funds to each Plaintiff prior to enactment of H.R. 1)

Notwithstanding its limited rescission of specific unobligated funds, H.R. 1 did not eliminate the remainder of the EPA's budget. To the contrary, the EPA requested funding for fiscal year 2025 for "environmental programs and management, including necessary expenses not otherwise provided for," and requested funding to support implementation of the Greenhouse Gas Reduction Fund, of which Solar for All is a part. U.S. EPA, *Fiscal Year 2025 Justification of Appropriation Estimates for the Committee on Appropriations, Tab 05: Environmental Programs and Management*, 5, 40 (March 2024), https://perma.cc/SU9G-69GU. And on March 15, 2025, Congress passed a continuing resolution appropriating roughly $3.2 billion in funding for the EPA in fiscal year 2025. *See* Pub. L. No. 119–4, § 1802(3), 139 Stat. 9, 30 (2025).

### F. The EPA Unilaterally Terminates Plaintiffs' Solar for All Grant Agreements and Drains Nearly All the Money from Plaintiffs' Spending Accounts

About a month after Congress passed H.R. 1, on August 7, EPA Administrator Lee Zeldin announced on social media that the EPA was "ending Solar for All for good" because H.R. 1 "eliminated the Greenhouse Gas Reduction Fund." Compl., ECF 1, ¶ 89. Administrator Zeldin asserted that, because of H.R. 1, the "EPA no longer has the statutory authority to administer the program or the appropriated funds to keep this boondoggle alive." *Id.* Shortly after, the EPA issued two documents to Plaintiffs purporting to terminate their Solar for All Grant Agreements.

13

*First*, the EPA sent each Plaintiff a Termination Memorandum. Exs. G1–G24 to Compl., ECF 1-9; *see also* Ex. G to Consolidated Compl., ECF 1-8. The Termination Memoranda were materially identical. Therein, the EPA stated that it was "hereby terminating" each Plaintiff's Solar for All Grant Agreement pursuant to H.R. 1. *See* Exs. G1–G24 to Compl., ECF 1-9, at 2 (Md.), 5 (Ariz.), 8 (Cal.), 11 (Colo.), 14 (Conn.), 17 (D.C.), 20 (Haw.), 23 (Ill.), 26 (Ky.), 29 (Me.), 32 (Mass.), 35 (Mich.), 38 (Minn.), 41 (Nev.), 44 (N.J.), 47 (N.M.), 50 (N.Y.), 53 (N.C.), 56 (Or.), 59 (Pa.), 62 (R.I.), 65 (Vt.), 68 (Wash.), 71 (Wis.) (all citing Pub. L. No. 119-21 (July 4, 2025)); *see also* Ex. G to Consolidated Compl., ECF 1-8, at 2 (Va.) (same). The EPA explained that it made the decision to terminate "existing grants because EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing" the Solar for All program. *Id*. According to the EPA, Congress's "repeal of the grant appropriations in [Clean Air Act Section] 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All." *Id*. Thus, the EPA reasoned, "the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All." *Id*. Indeed, the EPA went so far as to assert that "any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible." *Id*. The Termination Memoranda also stated that "[c]osts incurred . . . after this termination" were not allowable and  that an "amendment to the agreement to document the termination" would be forthcoming. *See* Exs. G1–G24 to Compl., ECF 1-9,  at 3 (Md.), 6 (Ariz.), 9 (Cal.), 12 (Colo.), 15 (Conn.), 18 (D.C.), 21 (Haw.), 24 (Ill.), 27 (Ky.), 30 (Me.), 33 (Mass.), 36 (Mich.), 39 (Minn.), 42

14

(Nev.), 45 (N.J.), 48 (N.M.), 51 (N.Y.), 54 (N.C.), 57 (Or.), 60 (Pa.), 63 (R.I.), 66 (Vt.), 69 (Wash.), 72 (Wis.); *see also* Ex. G to Consolidated Compl., ECF 1-8, at 3 (Va.) (same)

*Second*, as promised by the Termination Memoranda, the EPA sent each Plaintiff a second Assistance Amendment ("Termination Amendment").  Exs. H1–H24 to Compl., ECF 1-10; *see also* Ex. H to Consolidated Compl., ECF 1-9.  Once again, the Termination Amendments were materially identical.  The purpose of the Termination Amendments was "to stop work; terminate the agreement; reduce performance period duration, curtail scope of work; and waive certain reporting requirements."  Exs. H1–H24 to Compl., ECF 1-10, at 2 (Md.); 9 (Ariz.); 16 (Cal.); 23 (Colo.); 30 (Conn.); 37 (D.C.); 44 (Haw.); 51 (Ill.); 58 (Ky.); 65 (Me.); 71 (Mass.); 77 (Mich.); 84 (Minn.); 91 (Nev.); 98 (N.J.).; 104 (N.M.); 111 (N.Y.); 117 (N.C.); 124 (Or.); 131 (Pa.); 138 (R.I.); 145 (Vt.); 151 (Wash.); 158 (Wis.); *see also* Ex. H to Consolidated Compl., ECF 1-9, at 2 (Va.). The Termination Amendments ordered each recipient to "immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement."  *Id*.  The Termination Amendments explained that "[t]he Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award."  Exs. H1–H24 to Compl., ECF 1-10, at 5 (Md.); 12 (Ariz.); 19 (Cal.); 26 (Colo.); 33 (Conn.); 40 (D.C.); 47 (Haw.); 54 (Ill.); 61 (Ky.); 68 (Me.); 74 (Mass.); 80 (Mich.); 87 (Minn.); 94 (Nev.); 101 (N.J.).; 107 (N.M.); 114 (N.Y.); 120 (N.C.); 127 (Or.); 134 (Pa.); 141 (R.I.); 148 (Vt.); 154 (Wash.); 161 (Wis.); *see also* Ex. H to Consolidated Compl., ECF 1-9, at 5 (Va.).  The Termination Amendments asserted that "[c]onsistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable."  *Id.*

Within one week of unilaterally terminating each Plaintiff's Solar for All Grant Agreement, the EPA removed from each Plaintiff's ASAP account approximately 93 percent of the money that the EPA had agreed to provide each Plaintiff. *See* Exs. F1–24 to Compl., ECF 1-8; Ex. F to Consolidated Compl., ECF 1-7. Specifically, of the $2.9 billion that the EPA had agreed to provide Plaintiffs, the EPA unilaterally withdrew approximately $2.6 billion in previously obligated funds. *See* Exs. F1–24 to Compl., ECF 1-8; Ex. F to Consolidated Compl., ECF 1-7.

**G. Plaintiffs File Notices of Disagreement and the EPA Renders Them Moot**

After receiving the Termination Memoranda and Termination Amendments, most Plaintiffs promptly filed notices of disagreement and administrative disputes with the EPA in late August and early September. *See, e.g.*, Ex. I, ECF 1-11; Ex. J, ECF 1-12. Each administrative dispute was filed pursuant to 2 C.F.R. § 1500.15, under which "[a]n Affected Entity or its authorized representative may dispute an Agency Decision by electronically submitting a Dispute to the [Dispute Decision Officer] identified in the Agency Decision." These regulations further provide that the Dispute Decision Officer "will issue the Dispute decision within 180 calendar days from the date the Dispute is received," unless circumstances warrant an extension. 2 C.F.R. § 1500.17.

Shortly after this litigation began, the EPA sent a letter to each Plaintiff who filed an administrative dispute "to provide a status update." *See* ECF 52-3, at 1 (EPA Update on Dispute). Rather than addressing each dispute on the merits, the EPA declared that it had "rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement." *Id.* The EPA further claimed that "[t]he initiation of legal proceedings supersedes the internal EPA dispute resolution processes." *Id.* Therefore, the EPA explained, because each Plaintiff is "party to a lawsuit concerning the termination of [their] grant," "any further action on [their] dispute is now moot and will not be addressed by a Disputes

16

Decision Official decision under 2 CFR 1500.17." *Id.*  The EPA did not explain which lawsuit rendered Plaintiffs' administrative claims moot, nor why.  *See id.*

### H.  The EPA Pursues Closeout Procedures

In October 2025, the EPA emailed each Plaintiff materially identical Closeout Instructions. *E.g.*, Ex. L to Compl., ECF 1-14 (MCEC Closeout).  The Closeout Instructions provided that "[t]he award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition."  *Id.*  The Closeout Instructions further detailed that "[m]oving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant."  *Id.*  The Closeout Instructions required that each Plaintiff submit reports to the EPA "[w]ithin 120 calendar days of the end of the performance period (the date of termination that is listed in the award amendment)." *Id.*  In April 2026, shortly after this Court lifted the stay in this case, the EPA again emailed about closeout.  The EPA wrote to some Plaintiffs asking that they "assist [the EPA] by submitting closeout documents within the next two weeks."  *E.g.*, Magruder Decl. ¶ 20 (Md.).

## PROCEDURAL BACKGROUND

On October 15, 2025, Plaintiffs filed this lawsuit against the United States seeking damages for the EPA's breach of the Solar for All Grant Agreements.[6]  Compl., ECF 1.  Plaintiffs brought a

---

[6]  The following day, a group of States and the District of Columbia—representing all but one Plaintiff here—filed a separate lawsuit for declaratory and injunctive relief in the United States District Court for the Western District of Washington.  Compl., *Arizona v. U.S. EPA*, No. 2:25-cv-02015 (W.D. Wash. Oct. 16, 2025).  That lawsuit challenges the EPA's legal interpretation of H.R. 1 as the basis for terminating the Solar for All program and deobligating grant funds from the plaintiffs' ASAP accounts.  The lawsuit contends these actions were contrary to law, in excess of statutory authority, and arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; in violation of the U.S. Constitution's Appropriations Clause and separation of powers; and equitably *ultra vires*.  *Id.* at 26–33.  The plaintiffs in that case seek a declaration that the EPA's actions were unlawful; vacatur of the EPA's interpretation of H.R. 1 and actions that

claim for breach of contract (Count I) and a claim for breach of the duty of good faith and fair dealing (Count II). *Id.* ¶¶ 123–47. Plaintiffs seek money damages "in an amount to be determined at trial," "allowable pre- and post-judgment interest," and "reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412." *Id.* Prayer for Relief ¶¶ i-iv.

On January 21, 2026, the Court granted Defendant's motion to stay this case, issuing a stay for three months. ECF 58. On February 17, 2026, the Virginia Department of Energy filed suit against the United States seeking damages for the EPA's breach of its Solar for All Grant Agreement. *Virginia Dep't Energy v. USA*, No. 26-cv-00268 (Fed. Cl. Feb. 17, 2026). Upon consent of the parties, that case was consolidated with the instant action, which was designated the lead case. On April 20, 2026, after holding a status conference, this Court entered an order lifting the stay and setting a briefing schedule for summary judgment.

## ARGUMENT

### I.    Legal Standard

Under RCFC 56(a), "[s]ummary judgment is appropriate where the movant shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *Anderson v. United States*, 23 F.4th 1357, 1361 (Fed. Cir. 2022). This Court "view[s] the facts supported by evidence, as well as all inferences drawn therefrom, in the light

---

flow from that interpretation, including terminating the Solar for All program and deobligating the grant funds; and an injunction preventing Defendants "from reobligating, using, expending, or otherwise placing beyond the Court's jurisdiction any funds appropriated by Congress for the SFA Program except for purposes of the SFA Program." *Id.* at 33–34. Summary judgment briefing has concluded, and oral argument is set for May 8. The claims in this case and the District Court case reflect the "[t]wo-track litigation" contemplated by Justice Barrett, under which "challenges to the grant terminations belong in the [Court of Federal Claims]," and APA challenges "belong in district court." *NIH v. American Public Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) (Barrett, J., concurring). Meanwhile, two other lawsuits have brought APA challenges to the EPA's decisions to end the Solar for All program in U.S. district courts. *See Harris County v. U.S. EPA*, No. 1:25-cv-03646 (D.D.C.); *R.I. AFL-CIO v. U.S. EPA*, No. 25-cv-00510. (D.R.I.).

18

most favorable to the non-moving party." *Id.* "Issues involving contract interpretation often are resolved through summary judgment, because contract interpretation generally is a matter of law." *Northrop Grumman Computing Sys. v. United States*, 93 Fed. Cl. 144, 148 (2010).

## II.     This Court Has Jurisdiction

Plaintiffs' claim for breach of their Solar for All Grant Agreements is subject to this Court's jurisdiction.  Under the Tucker Act, 28 U.S.C. § 1491(a)(1), this Court has jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1364 (Fed. Cir. 2021) (quoting 28 U.S.C. § 1491(a)(1)).  Breach-of-contract claims therefore "fall within the reach of the Tucker Act" so long as the contract is "between the plaintiff and the government and entitle[s] the plaintiff to money damages in the event of the government's breach of that contract." *Greene v. United States*, 100 F.4th 1364, 1368–69 (Fed. Cir. 2024) (citation omitted).  And because "damages are always the default remedy for breach of contract," *id.* (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 885 & n.30 (1996) (plurality opinion)), a claim based on contract comes "armed with the presumption that money damages are available, so that normally no further inquiry is required," *id.* (quoting *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011)).[7]

In this case, Plaintiffs have brought a claim to recover monetary damages from the government's breach of their contracts.  Compl. ¶¶ 83–101, 123–135.  The federal government has

---

[7] The Federal Circuit has identified "three types of contracts [that] are exempt from the presumption that damages are available":  (1) "contracts that expressly disavow money damages"; (2) "agreements that are entirely concerned with the conduct of parties in a criminal case and that lack 'an unmistakable promise to subject the United States to monetary liability'"; and (3) certain types of "cost-sharing agreements with the government." *Boaz Hous. Auth.*, 994 F.3d at 1365 (quoting *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001)) (other internal quotations omitted); *see also Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1327 (Fed. Cir. 2016) (same).  The Solar for All Grant Agreements do not fall into any of those categories.

conceded elsewhere that this Court has jurisdiction over claims for money damages arising out of termination of Solar for All Grant Agreements. *See* ECF 55-2, at 25 (Defs.' Cross Mot. Summ. J. in *Arizona v. EPA et al.*) ("Plaintiffs may seek damages against EPA through a breach-of-contract suit in the Court of Federal Claims . . . ."); *id.* at 34 ("The loss of grant funding is monetary injury capable of being remedied by a damages award in the Court of Federal Claims."). As Plaintiffs have "elected to pursue a monetary claim in the Court of Federal Claims on a breach of contract theory," it is "therefore proper for the Claims Court to exercise jurisdiction over [Plaintiffs'] breach of contract claims." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1335 (Fed. Cir. 2021).[8]

Plaintiffs' claims are also ripe for adjudication. "[B]reach-of-contract claims . . . ripen when the breach occurs because that is the time when the nonbreaching party is entitled to bring suit." *Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 615–16 (2014), *aff'd*, 805 F.3d 1049 (Fed. Cir. 2015). Likewise, "under the doctrine of anticipatory repudiation," a plaintiff "need not wait for payment to become due to vindicate its right under the contract," but instead "is entitled to treat Defendant's statements as a present breach." *Doe v. United States*, 153 Fed. Cl. 629, 640 (2021) (citing *Franconia Assocs. v. United States*, 536 U.S. 129, 142–43 (2002)). Here,

---

[8] While the grant agreements at issue here are subject to jurisdiction under the Tucker Act, not every claim involving an instrument designated as a "grant agreement" is subject to such jurisdiction. *See Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021) (discussing various ways in which the federal government can decide to award and manage grants and avoid Tucker Act jurisdiction); *Harlem Globetrotters Int'l, Inc. v. United States*, 168 Fed. Cl. 31, 38 (2023) (noting "[t]he mere fact that the [federal government] was making a monetary grant to [grant] recipients is not itself sufficient to prove or disprove the existence of a contract between the [parties]"); *Pacito v. Trump*, No. 25-1313, 2026 WL 620449 at *19 (9th Cir. Mar. 5, 2026) (rejecting defendants' argument that the termination of plaintiffs' cooperative agreements raised contractual rights). For that reason, Plaintiffs' arguments in this forum are limited to the specific terms of the Solar for All Grant Agreements and are not to be construed as an assertion that every federal funding agreement constitutes a contract or that terminations of other federal funding agreements must be challenged in the U.S. Court of Federal Claims.

Plaintiffs' claims ripened when the EPA breached the contracts by improperly terminating them and announcing its intent to violate its obligation to perform in the future.

Further, although most Plaintiffs submitted an administrative dispute challenging the EPA's termination of its Solar for All Grant Agreement, Plaintiffs were not required to do so before bringing this action. "[I]n Tucker Act suits, a plaintiff is not required to exhaust a permissive administrative remedy before bringing suit." *Martinez v. United States*, 333 F.3d 1295, 1304 (Fed. Cir. 2003). Here, the relevant regulation provides that an affected party "*may* dispute an Agency Decision by electronically submitting a Dispute to the DDO [Dispute Decision Official] identified in the Agency Decision." 2 C.F.R. § 1500.15 (emphasis added). Because the regulation is "written in permissive terms"—in allowing that a party "may" file a dispute—the administrative remedy "is not expressly required, but merely permitted, and exhaustion of the administrative [] process was not necessary." *Rollock Co. v. United States*, 115 Fed. Cl. 317, 331–32 (2014) (quoting *Massie v. U.S. Dep't of Hous. & Urban Dev't*, 620 F.3d 340, 359 (3d Cir. 2010)).

In any event, the EPA has already denied the administrative disputes submitted by Plaintiffs and made clear that any further proceeding would be futile. After this action was filed, the EPA declared Plaintiffs' "administrative dispute[s] [ ] moot" and asserted that any further action on the dispute "will not be addressed by" an EPA official. *See supra* page 16. And the government has represented in other litigation that the "EPA *denied* Plaintiffs' requests to undo the grant terminations as moot." *See* ECF 52-2, at 7 (Defs.' Opp'n Prelim. Inj. in *Arizona v. EPA et al.*) (emphasis added). Given the EPA's refusal to resolve Plaintiffs' administrative disputes on the merits, this Court should decline to require prudential exhaustion of the administrative procedures. *See Rollock Co.*, 115 Fed. at 333 (exhaustion not required where "the administrative body 'is

21

shown to be biased or has otherwise predetermined the issue before it.'") (quoting *McCarthy v. Madigan*, 503 U.S. 140, 148 (1992)).

### III. Plaintiffs Are Entitled to Summary Judgment on Count I for Breach of Contract

To recover for a breach of contract, a plaintiff must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Cir. 2020). Because there are no genuine disputes of material fact and Plaintiffs have established all four elements as a matter of law, this Court should hold the EPA liable for its breach of contract and grant Plaintiffs partial summary judgment on liability on Count I.

#### A. The Solar for All Grant Agreements Constitute Valid Government Contracts Between Each Plaintiff and the EPA

In district court litigation, the EPA has asserted that the Solar for All Grant Agreements are binding contracts between the parties. *See* ECF 52-5, at 11 (Defs.' Opp. Mot. Summ. J. in *Harris County v. U.S. EPA et al.*) ("EPA executed materially identical contracts with each grantee . . . ."); ECF 65-2, at 33 (Defs.' Cross Mot. Summ. J. in *Arizona v. U.S. EPA et al.*) (arguing the district court cannot "adjudicate those contracts" in reference to "SFA grant agreements"). The EPA should not be permitted to take a different position now to evade this Court's review.

In any event, the Federal Circuit has made clear that "any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997); *see also Columbus Reg'l Hosp.*, 990 F.3d at 1339. Those requirements are: "mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Trauma Serv.*, 104 Fed. at 1326. Here, Defendant admits that the Solar for All Grant Agreements were entered into by government representatives with authority

22

to bind the government. *See* Answer, ECF 66, ¶¶ 63, 70. As to the remaining two factors, Plaintiffs have satisfied mutual intent to contract and consideration.

*i. Mutual Intent.* First, there was mutuality of intent to contract. "As a threshold condition for contract formation, there must be an objective manifestation of voluntary, mutual assent." *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003) (citing Restatement (Second) of Contracts § 18 (1981)). To prove such mutuality, "a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance." *Id.* Evidence of the government's intent to bind itself in contract can take several forms, including "the statute or regulations enabling the government's conduct or in documentary evidence, such as written agreements." *Boyd v. United States*, 134 F.4th 1348, 1352 (Fed. Cir. 2025); *see also Hometown Fin. v. United States*, 409 F.3d 1360, 1365–66 (Fed. Cir. 2005) (considering documents—including correspondence, memoranda, letters, and agreements—as "documentary proof of mutual intent" to contract).

Here, Plaintiffs and the EPA intended to contract. As discussed, *supra* pages 4–12, the process to mutually enter into these Solar for All Grant Agreements began in June 2023, when the EPA published a NOFO indicating its intent to issue "up to 60 awards" to "fund applicants applying to expand existing or develop new Solar for All programs." *See* Ex. A to Compl., ECF 1-3, at 7, 14–15. Each of the Plaintiffs expressed its interest to the EPA by applying for a Solar for All grant. *See e.g.*, Ex. B to Compl., ECF 1-4. After reviewing the applications, the EPA selected each Plaintiff as a grant recipient, issuing first an Initial Grant Agreement and later an Amended Grant Agreement to each Plaintiff. *See* Exs. C1–C24 to Compl., ECF 1-5; Exs. E1–25 to Compl., ECF 1-7; *see also* Ex. C to Consolidated Compl., ECF 1-4; Ex. E to Consolidated Compl., ECF 1-6. And the language of those Grant Agreements reflected a mutual intent to impose binding, legally enforceable obligations on both EPA and Plaintiffs. *See Columbus Reg'l Hosp.*, 990 F.3d at 133

23

("[T]he language of the agreement itself speaks in terms of binding obligations, not aspirations."). Taken in total, there was plainly mutual intent to contract.

Moreover, Plaintiffs accepted the EPA's offer to contract. In response to Plaintiffs' applications, the EPA issued an Initial Grant Agreement awarding each Plaintiff between $48.93 million and $249.4 million. *See* Exs. C1–C24 to Compl., ECF 1-5; *see also* Ex. C to Consolidated Compl., ECF 1-4. Subsequently, the EPA issued an Amended Grant Agreement. *See* Exs. E1–25 to Compl., ECF 1-7; *see also* Ex. E to Consolidated Compl., ECF 1-6. Each recipient could accept both the Initial and the Amended Grant Agreements by either drawing down funds or not filing a notice of disagreement within 21 days after the EPA award or mailing date. *See* Exs. C1–C24 to Compl., ECF 1-5; Exs. E1–25 to Compl., ECF 1-7; *see also* Ex. C to Consolidated Compl., ECF 1-4; Ex. E to Consolidated Compl., ECF 1-6; *supra* pages 5, 8–9. And each of the Plaintiffs in fact accepted its award by either drawing down funds within 21 days or not filing a notice of disagreement within 21 days. *See supra* pages 6, 9. Plaintiffs have therefore demonstrated offer and acceptance. *See Columbus Reg'l Hosp.*, 990 F.3d at 1339–40 ("An offer occurred when FEMA drafted the documents bearing the details of the grant agreement and presented those documents to the State. . . . Acceptance was effected when the parties' authorized agents signed the agreement."); *Thermalon Industries v. United States*, 34 Fed. Cl. 411, 415 (1995) (issuance of award constituted either an acceptance of the plaintiff's offer, or a counteroffer that plaintiff accepted when it commenced work on the grant project).

*ii. Consideration.* Further, each Solar for All Grant Agreement was supported by consideration. "To constitute consideration, a performance or a return promise must be bargained for." *Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1061 (Fed. Cir. 2002) (citing Restatement (Second) of Contracts § 71(1)). In *Columbus Regional Hospital*, the Federal Circuit considered

whether a plaintiff, who had applied for and received disaster relief assistance funds pursuant to an agreement between the Federal Emergency Management Agency ("FEMA") and the State of Indiana, had sufficiently alleged a contract for purposes of establishing jurisdiction under the Tucker Act. *Columbus Reg'l Hosp.*, 990 F.3d at 1338. Among other things, the court noted that Indiana agreed to comply with requirements attached to the receipt, use, and distribution of the federal disaster relief grants, including providing technical advice and assistance to subrecipients, obtaining necessary insurance, and acting on FEMA's behalf to recover funds that were wrongfully dispensed or spent. *Id*. at 1340. The court also observed that "at least some of the conditions imposed on Indiana confer a benefit on the government." *Id.* Therefore, the court concluded the agreement was supported by bargained-for consideration. *Id*.

Here, like in *Columbus Regional Hospital*, Plaintiffs received funds in exchange for their promises to carry out solar energy initiatives, pursuant to express Congressional direction, "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies." Pub. L. 117-59, § 60103, 136 Stat. 2066 (2022). Plaintiffs agreed, among other things, to "ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies." Exs. E1–E25 to Compl., ECF 1-7; Ex. E to Consolidated Compl., ECF 1-6; *see supra* page 9. Plaintiffs also agreed that the EPA could publish their final reports containing "detailed narratives describing program performance for the entire period of performance," including information about case studies, examples of efforts to meaningfully involve communities the program serves, and plans for key activities to be achieved by funded programs in the future. *See* Exs. E1–E25 to Compl., ECF 1-7, at 15 (Md.), 62 (Ariz.), 157 (Cal.), 204 (Colo.), 251 (Conn.), 298 (D.C.), 345 (Haw.), 389 (Ill.), 425 (Ky.), 472 (Me.), 518 (Mass.), 562 (Mich.), 594 (Minn.), 630 (Nev.), 677 (N.J.), 724

(N.M.), 771 (N.Y.), 818 (N.C.), 865 (Or.), 912 (Pa.), 959 (R.I.), 1006 (Vt.), 1053 (Wash.), 1097 (Wis.); *see also* Ex. E to Consolidated Compl., ECF 1-6, at 15 (Va.).  These state-level solar initiatives also directly benefitted the government by generating reductions in emissions, ensuring the United States could fulfill its obligations under international agreements to reduce greenhouse gas emissions.[9]  Taken as a whole, there was sufficient bargained-for consideration.  *See Thermalon Industries*, 34 Fed. Cl. at 415 (finding sufficient consideration where plaintiff would receive funding for its research and the government would in turn receive, *inter alia*, a royalty-free license to resulting intellectual property); *Laborant, LLC v. United States*, 180 Fed. Cl. 76, 86 (2026) (finding sufficient consideration where government promised to reimburse the plaintiff for "undertaking the actions specified in the Uninsured Program's Terms and Conditions" and where "the Program conferred a variety of benefits on the government").

Further, Plaintiffs' performance was bargained for throughout the approval process, including in the process of amending the Initial Grant Agreements and issuing Amended Grant Agreements.  For instance, as discussed, *supra* pages 7–8, under the terms of the Initial Grant Agreements, Plaintiffs were limited to drawing down no more than 2% of the EPA funding until they submitted additional documentation and worked with the EPA to refine their documents for

---

[9] U.N. Framework Convention on Climate Change (UNFCCC), The United States of America—Nationally Determined Contribution 5–6, 15–16, 24 (Dec. 2024), https://tinyurl.com/228ttnex (highlighting state-level, federally funded programs to "accelerate the deployment of zero- and low-emission technologies," including solar energy, to achieve national target); UNFCCC, The United States of America—Nationally Determined Contribution 3 (Apr. 2021), https://tinyurl.com/228ttnex ("The federal government will work with state, local, and tribal governments to support the rapid deployment of carbon pollution-free electricity generating resources" to achieve national target); *see also* U.S. EPA, EPA-190R24002, Fiscal Year 2025: Justification of Appropriation Estimates for the Committee on Appropriations 1242 (Mar. 2024), https://perma.cc/63FY-ZL8L (highlighting the launch of Solar For All as part of EPA's "integrated approach of regulations, partnerships, and technical assistance" to "achiev[ing] greenhouse gas emission reductions" and "[m]itigating the [c]auses … of [c]limate [c]hange").

26

approval.  Only after that process was completed did the EPA issue an Amended Grant Agreement to each Plaintiff and allow them access to their full awards.  Plaintiffs' performance was therefore bargained for, and their agreements to comply with the workplans and terms and conditions of the Solar for All Grant Agreements in exchange for funding constitute adequate consideration.  *See Columbus Reg'l Hosp.*, 990 F.3d at 1340 ("[C]onsideration may consist of performance or a return promise to perform, and performance 'may be a specified act of forbearance, or any one of several specified acts or forbearances of which the offeree is given the choice, or such conduct as will produce a specified result.'"); *Laborant*, 180 Fed. Cl. at 86 ("[A] bargained-for forbearance is as much consideration as a bargained-for action.")

## B. The EPA Had an Obligation Under Each Solar for All Grant Agreement to Provide Money to Each Plaintiff

The Solar for All Grant Agreements imposed binding obligations on Plaintiffs and the EPA. Each Plaintiff had an obligation to carry out its respective Solar for All program in compliance with the terms and conditions of the Solar for All Grant Agreements.  The EPA had a corresponding duty to provide funding to each Plaintiff.  And the EPA had the right to terminate the Solar for All Grant Agreements only pursuant to the terms and conditions of the Solar for All Grant Agreements.

"Determining the obligation or duty that arises out of a contract is a legal question of contract interpretation."  *San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 960 (Fed. Cir. 1989).  Contract interpretation "begins with the plain meaning of the agreement," construing provisions of a contract so "as to effectuate its spirit and purpose" and to "give[] a reasonable meaning to all of its parts."  *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).  "[W]here a contract fulfills or implements a statutory requirement, the underlying statute must guide the court's interpretation of the contract."  *Ohio v. United States*, 154 Fed. Cl. 233, 237 (2021).

27

In this case, the Amended Solar for All Grant Agreements expressly "incorporate[d] the necessary budget and workplan documentation" and were made "subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments." *See* Exs. E1–E25 to Compl., ECF 1-7, at 2 (Md.), 49 (Ariz.), 143 (Cal.), 191 (Colo.), 238 (Conn.), 285 (D.C.), 332 (Haw.), 379 (Ill.), 412 (Ky.), 459 (Me.), 506 (Mass.), 552 (Mich.), 585 (Minn.), 617 (Nev.), 664 (N.J.), 711 (N.M.), 758 (N.Y.), 805 (N.C.), 852 (Or.), 899 (Pa.), 946 (R.I.), 993 (Vt.), 1040 (Wash.), 1087 (Wis.); *see also* Ex. E to Consolidated Comp, ECF 1-6, at 2 (Va.).  Together, these documents imposed obligations on all parties to the agreement.  *See Suess v. United States*, 535 F.3d 1348, 1359 (Fed. Cir. 2008) (observing that "[a] contract need not be memorialized in a single document" but "may arise as a result of the confluence of multiple documents").

Under the Solar for All Grant Agreements, the EPA was obligated "to cost-share 100% of all approved budget period costs incurred" by each Plaintiff, "up to and not exceeding total federal funding" of each Grant Award.  Exs. E1–E25 to Compl., ECF 1-7; Ex. E to Consolidated Compl., ECF 1-6, at 2; *see supra* page 8.  In exchange, each Plaintiff promised to, among other things, "implement this grant in accordance with its EPA-approved Solar for All Workplan"; "only use the award to support . . . allowable activities"; and "ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies."  Exs. E1–E25 to Compl., ECF 1-7; Ex. E to Consolidated Compl., ECF 1-6, at 23-24 (Va.); *see supra* page 9.  And the Solar for All Grant Agreements limited the EPA's right to terminate to the grounds contained in the termination provision:

> EPA maintains the right to terminate the Assistance Agreement *only as specified* in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement

is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 339, through either a partial or full termination.

Exs. E1–E25 to Compl., ECF 1-7; Ex. E to Consolidated Compl., ECF 1-6, at 37–38 (Va.); *see supra* page 10.

Under the Solar for All Grant Agreements, then, the parties agreed that the EPA would pay Plaintiffs to administer their Solar for All programs, in compliance with the terms and conditions of the agreements. The parties further agreed that the only bases to terminate the Solar for All Grant Agreements would be one of three specifically enumerated grounds: (1) substantial noncompliance that materially impairs performance, (2) adequate evidence of waste, fraud, or abuse, or (3) a material misrepresentation of eligibility. Unless one of those conditions was satisfied, the EPA was obligated to reimburse 100% of the approved costs incurred by each Plaintiff up to the amount of each award.

### C. The EPA Breached Its Obligations by Improperly Terminating the Solar for All Grant Agreements and Repudiating Its Future Duty to Pay

The "[f]ailure to perform a contractual duty when it is due [constitutes] a breach of the contract." *Winstar Corp. v. United States*, 64 F.3d 1531, 1545 (Fed. Cir. 1995), *aff'd*, 518 U.S. 839 (2016). And when a defendant "ma[kes] a blanket statement that [it] would not abide by the [contract]," the plaintiff "is entitled to treat Defendant's statements as a present breach even before performance is due." *Doe*, 153 Fed. Cl. at 639–40; *see also Franconia Assocs.*, 536 U.S. at 148 (breach of contract shown either by "[f]ailure by the promisor to perform at the time indicated for performance," or by "the promisor's renunciation of a 'contractual duty *before* the time fixed in the contract for . . . performance'") (quoting 4 A. Corbin, *Contracts* § 959, p. 855 (1951)).

Here, the EPA breached its obligations under the Solar for All Grant Agreements by improperly terminating the agreements and by announcing its intent to refuse to reimburse

29

Plaintiffs in the future for approved Solar for All expenses. While the EPA has attempted to excuse its breach, none of its purported justifications can overcome the simple fact the contract defines the rights and obligations of the parties, and the EPA cannot now rewrite those terms.

       i.    *The EPA Breached the Solar for All Grant Agreements by Unilaterally Terminating Them Without Complying with the Termination Provision*

The EPA breached the Solar for All Grant Agreements by unilaterally terminating them without legitimate grounds to do so. Each Solar for All Grant Agreement contained an amended termination provision that allowed the EPA to terminate the agreement "only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status." Exs. E1–E25 to Compl., ECF 1-7; Ex. E to Consolidated Compl., ECF 1-6; *see supra* page 10. That is, each agreement allowed the EPA to terminate only for (1) substantial noncompliance with the terms and conditions; (2) adequate evidence of waste, fraud, or abuse; or (3) material misrepresentation of eligibility status.

Despite the fact that each agreement expressly limited the EPA's right to terminate to those three grounds, the EPA has never even purported to rely on any of those grounds. The EPA has never provided any Plaintiff with notice that it is in substantial noncompliance with the terms and conditions of its Solar for All Grant Agreement. *See* Magruder Decl. ¶ 21 (Md.); Mahoney Decl. ¶ 19 (Ariz.); Tesfai Decl. ¶ 23 (Cal.); Gomez Decl. ¶ 22 (Colo.); Dykes Decl. ¶ 20 (Conn.); Burger Decl. ¶ 18 (D.C.); Lau Decl. ¶ 20 (Haw.); Granda Decl. ¶ 22 (Ill.); Lyons Decl. ¶ 19 (Ky.); Cunningham Decl. ¶ 19 (Me.); Mahony Decl. ¶ 19 (Mass.); Wang Decl. ¶ 20 (Mich.); Pawlisch Decl. ¶ 21 (Minn.); Stasio Decl. ¶ 17 ( Nev.); Oomen Decl. ¶ 19 (N.J.); Stair Decl. ¶ 20 (N.M.); Poisson Decl. ¶ 20 (N.Y.); Woosely Decl. ¶ 21 (N.C.); Benner Decl. ¶ 21 (Or.); Shirley Decl. ¶ 26

(Pa.); Kearns Decl. ¶ 19 (R.I.); Bailey Decl. ¶ 19 (Vt.); Clifthorne Decl. ¶ 21 (Wash.); Rikkers Decl. ¶ 19 (Wis.); Maiden Decl. ¶ 17 (Va.).  Likewise, the EPA has offered no evidence—let alone "adequate evidence"—that any Plaintiff has committed waste, fraud, or abuse of its Solar for All funds.  *See id*.  And finally, the EPA has never notified any Plaintiff that it materially misrepresented its eligibility status.  *See id.*  Indeed, the EPA has admitted that it did not terminate the Solar for All Grant Agreements on any of these three grounds.  *See* Answer, ECF 66, ¶ 132 (admitting the grounds for termination were not substantial noncompliance, waste, fraud, or abuse, or misrepresentation of eligibility).

Terminating a contract when there are no grounds to do so under the terms of the contract constitutes a breach.  *See, e.g.*, *J. D. Hedin Const. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969) ("[U]se of the default-termination device, where there was in fact no default, constituted a breach of the contract, permitting award of common-law damages."); *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 347 (2013) (holding government could be liable "for a breach of contract based on an improper termination for convenience where the government has engaged in some form of improper self-dealing for its own benefit").  That is exactly what the EPA did here.  By terminating the Solar for All Grant Agreements without grounds to do so under the express terms of the amended termination provisions, the EPA breached the agreements.

   *ii. The EPA Repudiated Its Future Obligations to Perform Under the Solar for All Grant Agreements*

In improperly terminating the Solar for All Grant Agreements, the EPA also announced its intent to "violate [its] obligation to pay Plaintiff[s]" going forward.  *See Doe*, 153 Fed. Cl. at 639; *see also Hous. Auth Slidell v. United States*, 149 Fed. Cl. 614, 626 (Fed. Cl. 2020) ("The failure to pay money when due and owing is a paradigmatic breach of contract claim.").  As discussed above, the Solar for All Grant Agreements expressly required the EPA "to cost-share 100% of all approved

31

budget period costs incurred" by each Plaintiff, "up to and not exceeding total federal funding" of each grant award.  Exs. E1–E25 to Compl., ECF 1-7; Ex. E to Consolidated Compl., ECF 1-6; *see supra* page 8.  In the Termination Memoranda, however, the EPA informed Plaintiffs that it was unilaterally "terminating [their] Assistance Agreement[s]" and would not allow Plaintiffs to draw down reimbursements for "[c]osts incurred . . . after this termination."  Exs. G1–G24 to Compl., ECF 1-9; Ex. G to Consolidated Compl., ECF 1-8; *see supra* pages 13–14.  The EPA also sent each Plaintiff a Termination Amendment stating that "costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable."  Exs. H1–H24 to Compl., ECF 1-10; Ex. H to Consolidated Compl., ECF 1-9); *supra* pages 14–15.  Because those statements "constitute an anticipatory repudiation" of the EPA's promise to pay money as required under the Solar for All Grant Agreements, Plaintiffs are "entitled to treat Defendant's statements as a present breach even before performance is due under the contract."  *See Doe*, 153 Fed. Cl. at 640.

Therefore, the EPA breached its obligations under the Solar for All Grant Agreements, and this Court should hold the EPA liable for breach of contract.

### *iii.  The EPA's Purported Justifications Do Not Withstand Scrutiny*

In unilaterally terminating the Solar for All Grant Agreements and repudiating its future obligations, the EPA has sought cover for its actions on three fronts.  First, in the Termination Amendment, the EPA explained that it was exercising its right under "the Termination General Terms and Condition of this agreement to unilaterally terminate the award."  Exs. H1–H24 to Compl., ECF 1-10; *see also* Ex. H to Consolidated Compl., ECF 1-9; *see supra* page 15.  Second, in the same document, the EPA claimed it was exercising "its right under 2 C.F.R. 200.340" to unilaterally terminate the award.  *Id.*  Finally, in the Termination Memoranda, the EPA invoked

32

H.R. 1 to suggest that the change in law effectively revoked the Solar for All Grant Agreements. *See* Exs. G1–G24 to Compl., ECF 1-9; *see also* Ex. G to Consolidated Compl., ECF 1-8; *see supra* pages 14–15. Each of these arguments fails, and none can insulate the EPA from liability.

       *a. Terms and Conditions.* First, the EPA suggested, without any explanation, that it was invoking its right to terminate based on the termination terms and conditions of "this agreement." To the extent the EPA was asserting its right to terminate under the terms and conditions of "*this agreement*"—meaning the Termination Amendment—the EPA cannot retroactively supplant the amended termination provisions contained in the Solar for All Grant Agreements. Indeed, the General Terms and Conditions of the Amended Grant Agreement provides that parties "must agree to any modifications to the terms and conditions of this Award Agreement," and the "[a]greed-upon modifications must be in writing." Exs. E1–E25 to Compl., ECF 1-7, at 46 (Md.), 93 (Ariz.), 188 (Cal.), 235 (Colo.), 282 (Conn.), 329 (D.C.), 376 (Haw.), 410 (Ill.), 456 (Ky.), 503 (Me.), 549 (Mass.), 583 (Mich.), 615 (Minn.), 661 (Nev.), 708 (N.J.), 755 (N.M.), 802 (N.Y.), 849 (N.C.), 896 (Or.), 943 (Pa.), 990 (R.I.), 1037 (Vt.), 1084 (Wash.), 1118 (Wis.); *see also* Ex. E to Consolidated Compl., ECF 1-6, at 46 (Va.). Here, the amended termination provisions in the Solar for All Grant Agreements memorialized the EPA's promise to limit its right to unilateral termination, and the parties did not agree to modify it further. "When the government as contracting party makes a promise in exchange for a benefit, it is bound by mutual obligations, as any party to a contract is bound." *First Nationwide Bank v. United States*, 431 F.3d 1342, 1350–51 (Fed. Cir. 2005). Moreover, to the extent the EPA was asserting its right to terminate under the termination provisions of the Amended Grant Agreement, it pointed to no "term" or "condition" of that agreement that would allow such termination, and, as discussed, *supra* pages 30–31, none existed. Thus, the terms and conditions cannot insulate the EPA from liability.

*b.  Section 200.340.*  The EPA also can find no refuge in 2 C.F.R. § 200.340.  Section 200.340 is part of the Office of Management and Budget ("OMB") Guidance for Federal Financial Assistance, which applies to federal agencies that make federal awards to non-federal entities.  *See* 89 Fed. Reg. 30,046 (April 22, 2024).  It provides that a federal award may be unilaterally terminated in certain scenarios, 2 C.F.R. § 200.340(a), and it requires that a federal agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award," *id.* § 200.340(b).

Here, the terms and conditions of the Solar for All Grant Agreements allow the EPA to terminate "*only as specified* in . . . the version of 2 CFR 200.340 effective as of October 1, 2024, *when* the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status."  Thus, while the termination provision invokes § 200.340, it expressly limits the EPA's authority to terminate under § 200.340 to the circumstances that follow in the termination provision—that is substantial noncompliance, waste, fraud, or abuse, or material misrepresentation.

Even more, the version of § 200.340 that was incorporated into the Solar for All Grant Agreements does not automatically incorporate a right to terminate for any basis (i.e., to terminate for convenience).  To the contrary, outside of termination based on failure to comply with the terms and conditions of the federal award, these regulations allow a federal agency to unilaterally terminate only as specified in the termination provisions of the federal award.  For instance, under § 200.340(a)(4), an agency may terminate an award "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  *Id.* § 200.340(a)(4).  The federal government appears to rely

34

on this clause as the basis for its termination. *See* ECF 52-1, at 23 (Defs.' Opp'n Prelim. Inj. in *Arizona v. EPA et al.*) (citing 2 C.F.R. § 200.340(a)(4) as the EPA's "authority to terminate" the Solar For All grants). Yet this ground cannot support the EPA's termination, as it was not included in the terms and conditions of the Solar for All Grant Agreements.

The plain text of clause (a)(4) makes clear that an agency cannot terminate an award on the ground that the award no longer effectuates the agency's priorities unless the terms and conditions of the federal award explicitly allow the agency to do so. Indeed, the clause states that an agency may terminate on this ground only "pursuant to the terms and conditions of the Federal award." 2 C.F.R. § 200.340(a)(4). The regulations further require that agencies must "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." *Id.* § 200.340(b). Even more, when OMB revised its regulations in 2024, it aimed to provide greater clarity that clause (a)(4) simply allows agencies the option to "include a term and condition allowing termination by the Federal agency . . . if an award no longer effectuates the program goals or agency priorities," but it emphasized that an agency may terminate on this basis only "[p]rovided that the language is included in the terms and condition of the award." 89 Fed. Reg. at 30,089 And OMB "underscor[ed] the need for agencies . . . to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." *Id.*

Based on the regulatory text and context, courts have read this regulatory language to mean that clause (a)(4) "merely stands for the uncontroversial proposition that an agency may terminate an award in accordance with an express term or condition of the award that permits it to do so," and "that a change in agency priorities or goals must be stated in the terms and conditions of the award if it is to provide a basis for unilateral termination of the award." *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 670–71 (S.D.N.Y. 2025); *see also Climate United Fund v. Citibank,*

35

*N.A.*, 778 F. Supp. 3d 90, 115 (D.D.C. 2025) ("[EPA's] actions defy the plain language of the regulations that govern its decision-making in grant funding— it can only terminate a federal award on this basis pursuant to the terms and conditions of the federal award"), *vacated & remanded on other grounds*, 154 F.4th 809 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025) (per curiam).  In short, rather than granting the EPA unfettered license to terminate the award whenever it chooses, this "regulation establishes a boundary to ensure that when dealing with federal awards, no agency exceeds the legal authority granted to them." *Climate United Fund*, 778 F. Supp. 3d at 115; *see also Duffy,* 784, F. Supp. 3d at 671 ("Those provisions, and the security of contract they provide, would be rendered virtually illusory if, in the absence of some contractually agreed upon basis for termination, an agency could at any time terminate an award based upon some open-ended and unspecified change in the agency's priorities or its goals.").

Here, the terms and conditions of the Solar for All Grant Agreements "clearly and unambiguously specify all termination provisions"—that is, the EPA could terminate the awards "*only* as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, *when* the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status."  Exs. E1–E25 to Compl., ECF 1-7; Ex. E to Consolidated Compl., ECF 1-6; *see supra* page 10.  And by incorporating the "version of 2 CFR 200.340 effective as of October 1, 2024," the termination provision explicitly adopted that regulation's limitation that any ground for termination "must be included in the terms and condition of the award," *see* 89 Fed. Reg. 30,089.  Given that the Solar for All Grant Agreements did not include a provision allowing termination based on a change in

36

the agency's priorities or its goals, the EPA was not permitted to terminate on that basis nor on any other basis not specified in the contract. *See Nicholson v. United States*, 29 Fed. Cl. 180, 196 (1993) ("Where certain things are specified in detail in a contract, other things of the same general character relating to the same matter are generally held to be excluded by implication.") (quoting *Grismore on Contracts* § 105, at 164)). Accordingly, the EPA cannot rely on 2 C.F.R. § 200.340 to insulate itself from liability.

    *c. H.R. 1.* Finally, the EPA cannot avoid its contractual obligations by pointing to a change in law. When the EPA sent its Termination Memorandum to each Plaintiff, it attempted to excuse its breach by claiming that H.R. 1 "effectively and completely terminated the statutory authority and all appropriations related to Solar for All." Exs. G1–G24 to Compl., ECF 1-9; Ex. G to Consolidated Compl., ECF 1-8; *see supra* pages 13–14. Not only is this interpretation of H.R. 1 plainly incorrect,[10] it also provides the government with no cover for damages for its breach. As the Federal Circuit has made clear, "the United States is liable for the financial consequences" of "enact[ing] legislation that abrogates or modifies existing government contracts." *First Nationwide Bank*, 431 F.3d at 1351–52; *see also Cardiosom, L.L.C. v. United States*, 117 Fed. Cl. 526, 532 (2014) ("The risk of regulatory change rests with the agency, because it would be the agency that could not perform its promise and would be in breach and thus liable for damages."). Regardless of why the EPA breached the Solar for All Grant Agreements, or whether its arguments about H.R. 1 terminating the grants hold water (they do not), the EPA remains liable for its breach.

---

[10] As discussed, *supra* note 6, three separate lawsuits in federal district courts have challenged the EPA's interpretation of H.R. 1, arguing that the statute expressly rescinded only "unobligated" funding and therefore did not rescind or terminate the funds already obligated under the Solar for All Grant Agreements.

This principle was expressed in the *Winstar* line of cases, which arose out of the savings and loan crisis of the 1980s. *See generally United States v. Winstar Corp.*, 518 U.S. 839 (1996) (plurality opinion). There, financial institutions brought breach-of-contract claims against the United States in the Court of Federal Claims after the federal government was unable to perform its promise due to a change in the law. *Id.* at 868–71. The plurality "reject[ed] the suggestion that the Government may simply shift costs of legislation onto its contractual partners who are adversely affected by the change in the law, when the Government has assumed the risk of such change." *Id.* at 883. Relying on this principle, the Federal Circuit has repeatedly held that, though "Congress can enact legislation that abrogates or modifies existing government contracts," the United States remains "liab[le] for damages when the legislation materially affect[ed] performance of the contract." *First Nationwide Bank*, 431 F.3d at 1351; *accord Centex Corp. v. United States*, 395 F.3d 1283, 1304–11 (Fed. Cir. 2005) (noting that "a claim for damages arising from the breach of a contract by an act of Congress does not bar Congress from exercising its taxing power" but "merely ensures that if the exercise of that power breaches a particular contractual obligation, the injured party will have redress for the breach").

Here too, even if Congress had intended H.R. 1 to "retroactively abrogate[] contract provisions entered into under the prior policy"—which Plaintiffs dispute—"the United States is liable for the financial consequences of this action as it affected existing contracts." *First Nationwide Bank*, 431 F.3d at 1350–51. Indeed, a contrary reading would mean the government could point to a change in law to evade the obligations of its agreements, "thereby rendering plaintiffs' bargain valueless." *Amber Res. Co. v. United States*, 68 Fed. Cl. 535, 556 (2005), *aff'd*, 538 F.3d 1358 (Fed. Cir. 2008); *see also Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1357 (Fed. Cir. 2009) (suggesting that "making the contracts subject to whatever future federal

law or policy may hold would make the contracts illusory"). Therefore, regardless of whether EPA's interpretation of H.R. 1 is ultimately correct, the fact remains that EPA breached its contractual obligations by unilaterally terminating the Solar for All Grant Agreements without grounds to do so, and the EPA cannot hide behind H.R. 1 to avoid liability for monetary damages.

### D.    The EPA's Breach Caused Plaintiffs to Suffer Damages

Finally, Plaintiffs were harmed by the EPA's breach of the Solar for All Grant Agreements. At the liability stage, a plaintiff need only prove "a non-*de minimis* amount of damages to establish liability for a breach of contract." *Sys. Fuels v. United States*, 66 Fed. Cl. 722, 732 (2005). In other words, Plaintiffs must show "*some* evidence of damage to support a finding on liability." *Cosmo Constr. Co. v. United States*, 451 F.2d 602, 605–06 (Ct. Cl. 1971).

Plaintiffs easily meet this standard. Under each Solar for All Grant Agreement, the EPA promised each Plaintiff between $48.93 million and $249.4 million in federal funding to carry out their Solar for All programs. But the EPA cancelled each Solar for All Grant Agreements and siphoned millions of dollars from each Plaintiff's ASAP accounts. *See* Exs. F1–F24 to Compl., ECF 1-8; *see also* Ex. F. to Consolidated Compl., ECF 1-7. Each Plaintiff therefore suffered damages at least amounting to the difference between the sum promised and the sum received, as well as the costs that Plaintiffs incurred as a result of the unlawful terminations. *Cf. Oliva v. United States*, 961 F.3d 1359, 1365 (Fed. Cir. 2020) ("The purpose of damages for breach of contract is generally to put the wronged party in as good a position as he would have been had the contract been fully performed.") (quoting *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1332 (Fed. Cir. 2005)). Further, in unilaterally terminating the Solar for All Grant Agreements and ordering Plaintiffs to "stop work," the EPA has forced Plaintiffs to delay implementation of their Solar for All programs, impeding Plaintiffs from carrying out their promises to deploy solar

39

technology, reduce energy costs for low-income households, and reduce emissions from greenhouse gases. *See, e.g.*, Magruder Decl. ¶¶ 22–24 (Md.) (detailing lost staffing, paused contracts, ongoing compliance expenses, and lost energy savings); Mahoney Decl. ¶¶ 20–29 (Ariz.) (detailing reassigned staffing, lost job creation, forfeiture of technical assistance, and lost opportunity for improved energy costs and improved air quality). Finally, this delay potentially increases overhead and labor costs, and causes lost opportunities for funding, in a manner that would not have occurred absent the EPA's termination. *See Paul Hardeman, Inc. v. United States*, 406 F.2d 1357, 1361 (Ct. Cl. 1969) (listing "typical delay damages" to include "standby equipment expense, additional overhead, increased labor costs").

Overall, the evidence will show that these damages exceeded $2 billion in total. "[F]or present purposes," however, the inescapable inference of *some* damages "is sufficient," and this Court may leave "the amount of the plaintiff[s'] recovery . . . for subsequent proceedings." *Trans Ocean Van Serv. v. United States*, 426 F.2d 329, 346 (Ct. Cl. 1970). Accordingly, this Court should enter partial summary judgment in Plaintiffs' favor on liability and "evaluate plaintiffs' damage theories" "during the damages phase of this case." *Hometown Fin. v. United States*, 53 Fed. Cl. 326, 338 (2002).

## CONCLUSION

For the reasons discussed above, this Court should rule that the EPA breached Plaintiffs' Solar for All Grant Agreements and enter partial summary judgment in Plaintiffs' favor on liability under Count I.

40

Dated: May 7, 2026                   Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Lauren Gorodetsky*
Lauren Gorodetsky*
Keith M. Jamieson*
  *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
(410) 576-7057
LGorodetsky@oag.maryland.gov
kjamieson@oag.maryland.gov

*Counsel for the Maryland Clean Energy
Center*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Dylan C. Redor*
Dylan C. Redor*
Theodore A. McCombs
Marie Logan
Rebecca Hunter
  *Deputy Attorneys General*
Abigail Blodgett
Myung Park
  *Supervising Deputy Attorneys General*
California Department of Justice
300 S. Spring St.
Los Angeles, CA  90013
(213) 269-6706
dylan.redor@doj.ca.gov
marie.logan@doj.ca.gov

*Counsel for the California Public Utilities
Commission*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Jill Lacedonia*
Jill Lacedonia*

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

By  */s/ Joshua A. Katz*
Mary M. Curtin
  *Senior Litigation Counsel*
Joshua A. Katz*
  *Assistant Attorney General*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-7000
Mary.curtin@azag.gov
Joshua.Katz@azag.gov

*Counsel for the State of Arizona*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ Carrie Noteboom*
Carrie Noteboom
  *Assistant Deputy Attorney General*
David Moskowitz*
  *Deputy Solicitor General*
Cynthia Vitale
  *Assistant Attorney General*
Colorado Office of the Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
(720) 508-6000
Carrie.Noteboom@coag.gov
David.Moskowitz@coag.gov
Cynthia.Vitale@coag.gov

*Counsel for the State of Colorado*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
  COLUMBIA

By: */s/ William Stephens*

41

*Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5250
jill.lacedonia@ct.gov

*Counsel for the State of Connecticut*


**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
Hawaiʻi Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR *ex rel.*
ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE COMMONWEALTH OF KENTUCKY

By:  */s/ S. Travis Mayo*
S. Travis Mayo
  *General Counsel*
Taylor Payne
  *Chief Deputy General Counsel*
Laura C. Tipton
  *Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106

William Stephens*
  *Assistant Deputy Attorney General*
Lauren Marks
Lauren Cullum
  *Special Assistant Attorneys General*
Office of the Attorney General for the District
  of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C.  20001
William.Stephens@dc.gov
Lauren.marks@dc.gov
lauren.cullum@dc.gov

*Counsel for the District of Columbia*


**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Katharine Roller*
Katharine Roller*
  *Complex Litigation Counsel*
Elizabeth B. Scott*
  *Assistant Attorney General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 519-1842
Katharine.roller@ilag.gov

*Counsel for Illinois Finance Authority*


**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Caleb Elwell*
Caleb E. Elwell
  *Assistant Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8545
Caleb.elwell@maine.gov

*Counsel for the State of Maine*

42

Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: /s/ Amy Laura Cahn
Amy Laura Cahn*
   *Special Assistant Attorney General*
Terrence Vales
   *Assistant Attorney General*
Katherine Dirks*
   *Chief State Trial Counsel*
Vanessa Arslanian
   *State Trial Counsel*
One Ashburton Place
Boston, MA 02108
(617) 963-2277
amy.laura.cahn@mass.gov
terrence.vales@mass.gov
katherine.dirks@mass.gov
vanessa.arslanian@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: /s/ Ryan Pesch
Ryan Pesch
Cat Rios-Keating
   *Special Assistant Attorneys General*
Brian Carter
   *Special Counsel*
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
651-728-7116
ryan.pesch@ag.state.mn.us
catherine.rios-keating@ag.state.mn.us

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: /s/ Neil Giovanatti
Neil Giovanatti*
Polly Synk*
   *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
SynkP@michigan.gov

*Counsel for the State of Michigan*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: /s/ K. Brunetti Ireland
K. Brunetti Ireland*
   *Chief Deputy Attorney General*
   *Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for Nevada Clean Energy Fund*

43

brian.carter@ag.state.mn.us

*Counsel for the State of Minnesota*

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Daniel Resler*
Daniel Resler
Lauren E. Van Driesen
Jack Ventura
   *Deputy Attorneys General*
Office of the Attorney General
33 Washington Street, Ninth Floor
Newark, NJ 07101
(973) 648-4726
Daniel.Resler@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Matthew Eisenson*
Matthew Eisenson*
   *Assistant Attorney General*
Kelsea Suarez*
   *Special Assistant Attorney General*
Environmental Protection Bureau
Office of the Attorney General
28 Liberty Street, 19th Floor
(212) 416-8481
matthew.eisenson@ag.ny.gov

*Counsel for the New York State Energy
Research and Development Authority*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: /s/ *Coby Howell*
Coby Howell
   *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ J. Spenser Lotz*
J. Spenser Lotz*
   *Assistant Attorney General*
Environmental Protection Bureau
201 Third St. NW, Suite 300
Albuquerque, NM 87102
(505) 616-7560
slotz@nmdoj.gov

*Counsel for the State of New Mexico*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
CHIEF DEPUTY ATTORNEY GENERAL

By /s/ Daniel T. Wilkes
Daniel T. Wilkes*
   *Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6415
dwilkes@ncdoj.gov

*Counsel for the State of North Carolina*

**PENNSYLVANIA ENERGY
DEVELOPMENT AUTHORITY**

By: */s/ Michael J. Heilman*
Michael J. Heilman
   *Litigation Coordinator*
Michael A. Braymer
   *Chief Counsel*

44

Fax (971) 673-5000
coby.howell@doj.oregon.gov

*Counsel for the State of Oregon*

Pennsylvania Department of Environmental
Protection
Office of Chief Counsel
400 Waterfront Drive
Pittsburgh, PA 15222
Phone: 412-442-4241
Email: mheilman@pa.gov

*Counsel for Pennsylvania Energy
Development Authority*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Nicholas M. Vaz*
Nicholas M. Vaz
   *Special Assistant Attorney General*
Office of the Attorney General
Environment and Energy Unit Chief
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
   *Solicitor General*
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

By: */s/ C. L. Junine So*
C. L. Junine So*
Sarah E. Smith-Levy*

   Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104
(206) 464-7744
junine.so@atg.wa.gov
sarah.e.smith-levy@atg.wa.gov
*Counsel for the State of Washington*

**WISCONSIN ECONOMIC
DEVELOPMENT CORPORATION**

By: */s/ Jennifer H. Campbell*
Jennifer H. Campbell
   *Chief Legal Officer*
2352 S. Park St., Suite 303
Madison, WI 53713
(608) 210-6811
jennifer.campbell@wedc.org

*Counsel for Wisconsin Economic
Development Corporation*

By: */s/Darrell W. Kuntz, III*
Darrell W. Kuntz, III (VSB: 95491)*
*Assistant Attorney General*
Katherine Kulbok (VSB: 90853)

45

*Assistant Attorney General*
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 225-3643
dkuntz@oag.state.va.us
kkulbok@oag.state.va.us

*Counsel for the Virginia Department of Energy*

*\* Admitted to appear in this Court on behalf of Plaintiffs*