Consolidated Nos. 25-1738C (lead); 26-268C
(Senior Judge Smith)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

MARYLAND CLEAN ENERGY CENTER, *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' CONSOLIDATED MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

GEOFFREY M. LONG
Assistant Director

CATHERINE M. YANG
Trial Attorney
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-4336
Email: catherine.m.yang@usdoj.gov

Attorneys for Defendant

**TABLE OF CONTENTS**

**PAGE**

STATEMENT OF THE ISSUES..............................................................................................2

STATEMENT OF THE CASE.............................................................................................2

    I.      Greenhouse Gas Reduction Fund and Solar For All...................................................2

    II.     Grant Regulations ........................................................................................................2

    III.    Grant Agreements .........................................................................................................3

    IV.    Congress Repeals Section 134 and EPA Terminates the Grant Agreements ...........5

ARGUMENT ......................................................................................................................7

    I.      Legal Standard .............................................................................................................7

    II.     Plaintiffs Have Not Established Liability as a Matter of Law .................................7

          A. Plaintiffs' View of Their Expectation Interests Misunderstands the Grant
              Agreements ..........................................................................................................8

          B. Plaintiffs Cannot Establish the Damages They Claim.....................................10

             1. Costs Due to Termination ............................................................................10

             2. "Potentially Increase[d]" Costs and Lost Opportunities............................12

             3. Value of the Grants .....................................................................................14

CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

**CASES**                                                                                              **PAGE(S)**

*Am. Ship Bldg. Co. v. United States*,
   654 F.2d 75 (Ct. Cl. 1981) ............................................................................. 8

*Arctic Corner, Inc. v. United States*,
   845 F.2d 999 (Fed. Cir. 1988) ...................................................................... 12

*Bluebonnet Sav. Bank, F.S.B. v. United States*,
   339 F.3d 1341 (Fed. Cir. 2003) .......................................................... 10, 12, 18

*Boaz Hous. Auth. v. United States*,
   994 F.3d 1359 (Fed. Cir. 2021) .................................................................... 19

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ..................................................................................... 19

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................... 14

*Commerce Int'l Co. v. United States*,
   338 F.2d 81 (Ct. Cl. 1964) .............................................................................. 8

*Cosmo Constr. Co. v. United States*,
   451 F.2d 602 (Ct. Cl. 1971) ...................................................................... 7, 12

*Crooker v. United States*,
   828 F.3d 1357 (Fed. Cir. 2016) .................................................................... 20

*Crown Operations Int'l, Ltd. v. Solutia Inc.*,
   289 F.3d 1367 (Fed. Cir. 2002) ...................................................................... 7

*Dingley v. Oler*,
   117 U.S. 490 (1886) ..................................................................................... 11

*Doe v. United States*,
   153 Fed. Cl. 629 (2021) ................................................................................ 16

*Estate of Blanco v. Prudential Ins. Co. of Am.*,
   606 F.3d 399 (7th Cir. 2010) ....................................................................... 14

*Fields v. United States*,
   147 Fed. Cl. 352 (2020) ................................................................................ 13

*Frankel v. United States*,
  842 F.3d 1246 (Fed. Cir. 2016) ................................................................................. 7

*Gilead Scis., Inc. v. United States*,
  160 Fed. Cl. 330 (2022) ........................................................................................... 8

*Hous. Auth. Slidell v. United States*,
  149 Fed. Cl. 614 (Fed. Cl. 2020) ........................................................................... 15

*Lucas v. United States*,
  25 Cl. Ct. 298 (1992) ............................................................................................. 13

*Lummi Tribe v. United States*,
  870 F.3d 1313 (Fed. Cir. 2017) ............................................................................. 19

*McDonnell Douglas Corp. v. United States*,
  37 Fed. Cl. 295 (1997) ........................................................................................... 10

*Nat'l Ctr. for Mfg. Scis. v. United States*,
  114 F.3d 196 (Fed. Cir. 1997) ............................................................................... 19

*Oliva v. United States*,
  961 F.3d 1359 (Fed. Cir. 2020) ............................................................................... 7

*Paul Hardeman, Inc. v. United States*,
  186 Ct. Cl. 743 (1969) ........................................................................................... 14

*Puritan Assocs. v. United States*,
  566 F.2d 1191 (Ct. Cl. 1977) ................................................................................... 8

*Robinson v. United States*,
  305 F.3d 1330 (Fed. Cir. 2002) ............................................................................. 16

*Rockingham Cnty. v. Luten Bridge Co.*,
  35 F.2d 301 (4th Cir. 1929) ................................................................................... 17

*San Carlos Irrigation v. United States*,
  111 F.3d 1557 (Fed. Cir. 1997) ............................................................................. 13

*SmithKline Beecham Corp. v. Apotex Corp.*,
  439 F.3d 1312 (Fed. Cir. 2006) ............................................................................. 20

*State of Arizona v. EPA*,
  No. 2:25-cv-2015, 2026 WL 1533001 (W.D. Wash. June 1, 2026) ....................... 19

*Stegall v. United States*,
  19 Cl. Ct. 765 (1990) ............................................................................................. 12

*Tex. Adv. Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*,
  895 F.3d 1304 (Fed. Cir. 2018)..................................................................... 20

*Tretchick v. Dep't of Transp.*,
  109 F.3d 749 (Fed. Cir. 1997)...................................................................... 11

*White v. Delta Constr. Int'l, Inc. v. United States*,
  285 F.3d 1040 (Fed. Cir. 2002)......................................................... 12, 17, 18

*Willems Indus., Inc. v. United States*,
  295 F.2d 822 (Ct. Cl. 1961) ..................................................................*passim*

**STATUTES**

42 U.S.C. § 7434.............................................................................................. 2

Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025)................................... 5

**RULES**

RCFC 56 .................................................................................................. 5, 7, 8

**REGULATIONS**

2 C.F.R. Part 200....................................................................................*passim*

2 C.F.R. § 1500.2 ............................................................................................ 2

31 C.F.R. Part 205...................................................................................*passim*

48 C.F.R. § 16.301-1....................................................................................... 9

48 C.F.R. § 16.303(a)...................................................................................... 9

48 C.F.R. § 31.103(b) ..................................................................................... 9

**OTHER AUTHORITIES**

Farnsworth on Contracts (4th ed.) § 12.08 ................................................... 17

Restatement (Second) of Contracts § 347..................................................... 17

Williston on Contracts (4th ed.) § 63:44........................................................ 16

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

MARYLAND CLEAN ENERGY CENTER,
*et al.*,

          Plaintiffs,

          v.

THE UNITED STATES,

          Defendant.

Consolidated Nos. 25-1738C (lead)
                    26-268C

(Senior Judge Smith)

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' CONSOLIDATED MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, the United States, respectfully responds to the consolidated motion for partial summary judgment filed by 25 states and state instrumentalities (plaintiffs). ECF No. 72 (Mot.).

In this action, plaintiffs seek *billions* of dollars as purported "damages" from the Environmental Protection Agency's (EPA) termination of five-year grants within the first year of the grants. Yet on the critical issue—whether plaintiffs can establish the fact of damages with certainty, as binding precedent requires—plaintiffs offer less than two pages of explanation.

Plaintiffs' paltry analysis, and ultimately their underlying theory, falls well short of their burden on summary judgment and cannot be squared with their grant agreements, the grant regulations, and the caselaw. The expectation interest plaintiffs claim is belied by the structure of the grant agreements, which provided only that EPA would reimburse "approved" and "incurred" costs, pursuant to incorporated grant regulations that include extensive cost principles governing allowable costs for Federal grants. Plaintiffs' inability to show (1) that they seek damages for costs *incurred*, (2) that are *recoverable* under the grant agreements and governing regulations, and (3) that have been *submitted* for, but denied, reimbursement, is fatal to their motion. This failure of proof on an essential element of plaintiffs' liability claim is reason enough to deny plaintiffs' motion.

1

**STATEMENT OF THE ISSUES**

Whether plaintiffs have failed to establish liability, where they cannot establish the fact of damages with certainty because their cursory arguments are contrary to the cost-share structure of the grant agreements, incompatible with the regulations governing their grants, inconsistent with the purpose of damages, and impermissibly speculative.

**STATEMENT OF THE CASE**

I.     **Greenhouse Gas Reduction Fund and Solar For All**

In 2022, Congress added Section 134 to the Clean Air Act, which appropriated $26.97 billion to the EPA Administrator for a "Greenhouse Gas Reduction Fund." 42 U.S.C. § 7434(a)-(c) (repealed 2025). Of that total, Congress appropriated $7 billion to EPA to make grants to states and other eligible recipients to carry out "greenhouse gas emission reduction activities, as determined appropriate by the Administrator." *Id.* § 7434(a)(1).

In 2023, EPA announced a funding opportunity, titled Solar for All, to implement Section 134(a)(1). Appx1. EPA subsequently selected 60 grantees to receive Solar for All funding, including plaintiffs here.

II.    **Grant Regulations**

EPA's grant agreements with each plaintiff were "subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments." *E.g.*, Appx84 (Maryland); Appx130 (Virginia). The applicable regulations include 2 C.F.R. Part 200, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (uniform guidance), which govern Federal grants. *See, e.g.*, 2 C.F.R. §§ 200.100, 200.101(a); Appx85 (citing "2 CFR 200, 2 CFR 1500, and 2 CFR 33"); Appx131 (same). EPA's grant regulations at 2 C.F.R. Part 1500 adopt and supplement the uniform guidance in 2 C.F.R.

2

Part 200.  *See* 2 C.F.R. § 1500.2.

The uniform guidance covers the full lifecycle of a grant—from pre-award to termination and closeout—and sets forth extensive cost principles and audit requirements applicable to Federal grants.  2 C.F.R. Part 200, Subparts B, C, D, E, F.  Each of plaintiffs' grant agreements provided that "[a]ll costs charged to the award to support [allowable activities] must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500."  *E.g.*, Appx106 (Maryland); Appx152 (Virginia).

Additional regulations in 31 C.F.R. Part 205 "prescribe[] rules for transferring funds between the Federal government and States for Federal assistance programs."  31 C.F.R. § 205.1(a).  Each plaintiff's grant agreement also incorporated these regulations.  *E.g.*, Appx87 (Maryland); Appx133 (Virginia); EPA General Terms and Conditions at 4-5, https://perma.cc/H49K-6FEY ("Proper Payment Drawdown for State Recipients"); *see also* 2 C.F.R. § 200.305(a).  Under those regulations, States "must minimize the time between the drawdown of Federal funds from the Federal government and their disbursement for Federal program purposes."  31 C.F.R. § 205.33(a).  Agencies "must limit a funds transfer to a State to the minimum amounts needed by the State and must time the disbursement to be in accord with the actual, immediate cash requirements of the State in carrying out a Federal assistance program or project."  *Id.*  Thus, "drawdown" of Federal funds begins with a state's "request[]" for such funds, *id.* § 205.2, and must "accord with the actual, immediate cash requirements of the State" consistent with the applicable regulations and grant agreement, *id.* § 205.33(a).

## III.    Grant Agreements

The Solar for All grants provided that EPA would "cost-share 100.00% of all approved budget period costs incurred" by each plaintiff, "up to and not exceeding total federal funding"

specified in each grant award, which ranged between $48.93 million and $249.4 million. Appx84, Appx130; *see also* Mot. 8. That cost share, and approval of costs incurred, was expressly "subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments." Appx84, Appx130. The grant agreements covered a five-year period of performance. *Id.*

In exchange, plaintiffs agreed to, for example, (1) "comply with the statutory requirements of Section 134 of the Clean Air Act," Appx118, Appx164; (2) "comply with the current EPA general terms and conditions," Appx87, Appx133; (3) submit "performance reports" and "transaction-level and project-level data," "in accordance with information collection instruments approved through GGRF [Greenhouse Gas Reduction Fund] Accomplishment Reporting," Appx97-98, Appx143-144; (4) develop an EPA-approved "Quality Management Plan," Appx102, Appx148; (5) develop an EPA-approved "Quality Assurance Project Plan," Appx102-103, Appx148-149; and (6) adhere to the grant regulations within 2 C.F.R. Parts 200 and 1500, *see generally* Appx84-175. Plaintiffs also "agree[d] to implement this grant in accordance with its EPA-approved Solar for All Workplan." Appx105, Appx151.

The agreements gave EPA an "[o]versight and [m]onitoring" role "to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All Program." Appx125, Appx171. Those oversight and monitoring activities included, among other things, (1) "[p]articipating in project activities," (2) "[r]eviewing the qualifications of key personnel," (3) "[c]losely monitoring the recipient's management and oversight of subrecipients and procedures," (4) "[c]losely monitoring the recipient's performance," (5) "[r]eviewing and commenting on performance reports," and (6) "[v]erifying that the recipient is expending the award on allowable activities." Appx125-126, Appx171-172.

4

## IV.    Congress Repeals Section 134 and EPA Terminates the Grant Agreements

On July 4, 2025, less than one year into the five-year Solar for All grants, Congress "repealed" Section 134—the provision that authorized the Greenhouse Gas Reduction Fund, including Solar for All—and "rescinded" all "unobligated balances of amounts made available to carry out that section." Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025).

EPA subsequently terminated the Solar for All grants in August 2025. EPA explained that Congress's repeal of Section 134 "repeals the underlying authority for the Solar for All Program," such that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients." Appx176-177, Appx184-185. As such, EPA issued a termination amendment to each grantee. *E.g.*, Appx178-183 (Maryland); Appx186-191 (Virginia).

EPA explained that, given "the early nature" of any expenditures made in just the first year of the five-year grant agreements, EPA "expect[s] any harms to interests suffered to be remedied and remediable by the close out process[]." Appx176-177, Appx184-185; *see also* Appx181 (providing that "[c]osts after termination are allowable" pursuant to the regulations); Appx189 (same). EPA confirmed that, through the closeout process, each grantee would be entitled to "allowable costs incurred up to the date of [termination]," certain costs incurred "after this termination," and "reasonable and necessary costs" incurred to close out their grant. *Id.*[1]; *see also* 2 C.F.R. §§ 200.403, 200.472. For instance, "reasonable and necessary costs that might occur after the date of the termination" would "include – but are not limited to – personnel costs

---

[1] Plaintiffs' assertions that the termination memoranda and termination amendments said "'[c]osts incurred … after this termination' were not allowable," *see* Mot. 14-15, are not supported by the documents. The documents expressly set out that costs incurred after termination are allowable consistent with the cost regulations. Appx176-177, Appx181, Appx184-185, Appx189; *see* RCFC 56(c)(1).

for preparing and submitting [the] final technical report, preparing [the] Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs." Appx192-194.  Upon a grantee's submission of their costs and EPA's review and certification, the grantee's account "will be reconciled to allow for final drawdown of allowable costs." Appx193.

EPA therefore retained a recorded obligation of 7 percent of each grantee's award, representing a preliminary estimate of grantees' closeout costs. ECF No. 69 ¶ 7; ECF No. 67 ¶ 7. Following termination, plaintiffs that requested payment from their accounts "for allowable expenses incurred before the termination date" received those payments. ECF No. 72-1 (MD Decl.) ¶ 18 ("On August 7, 2025, MCEC withdrew $156,366.14 from its ASAP account for allowable expenses incurred before the termination date."); *see also, e.g.*, ECF No. 72-4 (CO Decl.) ¶ 20; ECF No. 72-12 (MI Decl.) ¶ 19; ECF No. 72-13 (MN Decl.) ¶¶ 16, 20; ECF No. 72-15 (NJ Decl.) ¶ 17; ECF No. 72-17 (NY Decl.) ¶ 18; ECF No. 72-25 (VA Decl.) ¶ 16.

Additionally, prior to the termination notice, every plaintiff that requested payment from their accounts "to pay for allowable costs" had received that payment. MD Decl. ¶ 13; ECF No. 72-2 (AZ Decl.) ¶ 12; ECF No. 72-3 (CA Decl.) ¶ 17; CO Decl. ¶ 15; ECF No. 72-5 (CT Decl.) ¶ 13; ECF No. 72-6 (DC Decl.) ¶ 12; ECF No. 72-7 (HI Decl.) ¶ 14; ECF No. 72-8 (IL Decl.) ¶ 16; ECF No. 72-9 (KY Decl.) ¶ 13; ECF No. 72-10 (ME Decl.) ¶ 13; ECF No. 72-11 (MA Decl.) ¶ 13; MI Decl. ¶ 13; MN Decl. ¶ 13; ECF No. 72-14 (NV Decl.) ¶ 11; ECF No. 72-16 (NM Decl.) ¶ 13; NY Decl. ¶ 12; ECF No. 72-18 (NC Decl.) ¶ 13; ECF No. 72-19 (OR Decl.) ¶ 14; ECF No. 72-21 (RI Decl.) ¶ 13; ECF No. 72-22 (VT Decl.) ¶ 13; ECF No. 72-23 (WA

Decl.) ¶ 13; ECF No. 72-24 (WI Decl.) ¶ 13; VA Decl. ¶ 13.[2]

## ARGUMENT

### I.      Legal Standard

The Court may only grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." *Frankel v. United States*, 842 F.3d 1246, 1249 (Fed. Cir. 2016); *see also Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) ("[T]he evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the nonmovant.").

### II.     Plaintiffs Have Not Established Liability as a Matter of Law

Most of plaintiffs' motion addresses issues that EPA has never contested, such as this Court's jurisdiction and that their grant agreements are contracts. We therefore focus our response on the key issue fatal to plaintiffs' claims: damages.

As plaintiffs recognize, they cannot recover for breach of contract unless they establish four elements: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, *and* (4) damages caused by the breach. *Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Cir. 2020) (cited at Mot. 22). The Court cannot render a liability finding unless the plaintiff establishes "*some* evidence of damage." *Cosmo Constr. Co. v. United States*, 451 F.2d 602, 605 (Ct. Cl. 1971) (cited at Mot. 39). Precedents consistently hold that a

---

[2] Plaintiffs' motion describes administrative disputes "most" of them submitted, which EPA found moot given the pendency of plaintiffs' lawsuit. Mot. 16-17. It is unclear what significance plaintiffs place on those administrative disputes. The administrative disputes have no impact on any of the issues before this Court, and plaintiffs do not argue otherwise.

plaintiff does not establish liability simply by showing that the Government failed to comply with a contractual term.  *See, e.g.*, *Am. Ship Bldg. Co. v. United States*, 654 F.2d 75, 80-81 (Ct. Cl. 1981) (rejecting plaintiff's argument that its loss was "a matter of quantum, which was severed and deferred to a later day"); *Puritan Assocs. v. United States*, 566 F.2d 1191, at *2 (Ct. Cl. 1977) ("Even if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions."); *Commerce Int'l Co. v. United States*, 338 F.2d 81, 86 (Ct. Cl. 1964) ("Once a breach … has been established, the contractor must still show, as in all contract cases, that damage ensued.").  In short, "damages are essential to proving liability."  *Gilead Scis., Inc. v. United States*, 160 Fed. Cl. 330, 342 (2022).

"The claimant bears the burden of proving the fact of loss with certainty," and the requisite "fact of loss" must be "the natural and proximate result of the breach of contract." *Willems Indus., Inc. v. United States*, 295 F.2d 822, 831 (Ct. Cl. 1961).  Indeed, a party moving for summary judgment cannot prevail unless they demonstrate that there is *no* genuine dispute of material fact and that they are entitled to judgment on the issue as a matter of law.  RCFC 56(a).

Here, plaintiffs have asserted three categories of claimed damages: (1) costs associated with the termination of their grants, (2) potential increase in labor costs and lost opportunities, and (3) the remaining value of their grants.  Mot. 39-40.  Each category of claimed damages fails for distinct, though related, reasons.  Plaintiffs' damages theory, at its core, is predicated on a misunderstanding of the expectation interests arising out of the grant agreements.

### A.      Plaintiffs' View of Their Expectation Interests Misunderstands the Grant Agreements

Plaintiffs' motion reveals their fundamental misunderstanding of the expectation interests arising out of the grant agreements, which dooms their damages theory, and ultimately their

entitlement to judgment on liability.

The only monetary promise in the grant agreements is to reimburse costs incurred by the grantees to the extent that they are allowable, reasonable, and allocable under the cost regulations (among other conditions). The grant agreements provide that all funding is "subject to applicable EPA regulatory and statutory provisions," and that "[a]ll costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500." Appx84, Appx106, Appx130, Appx152. The cost regulations, in turn, repeatedly require that costs must be "incurred," *e.g.*, 2 C.F.R. §§ 200.100(c), 200.343, 200.403(h), 200.405(a), and restrict drawdown to funds needed for "actual, immediate cash requirements," 31 C.F.R. § 205.33(a). Such costs must also be "allowable," "reasonable," and "allocable," as extensively detailed in the regulations. *E.g.*, 2 C.F.R. §§ 200.403, 200.404, 200.405; *see also* Appx126, Appx171 (providing that EPA will "[v]erify[] that the Recipient is expending the award on allowable activities" and "[p]eriodically review[] costs incurred by the Recipient … to ensure appropriate expenditure of grant funds").

In other words, the grant agreements reflect a limited promise to reimburse certain categories of costs incurred, up to the face value of the grant—not a promise to compensate a contractor for its output. This contract type is not anomalous. By analogy, the FAR recognizes cost-reimbursement contracts. These types of contracts "provide for payment of allowable incurred costs, to the extent prescribed in the contract." 48 C.F.R. § 16.301-1; *see also, e.g.*, *id.* § 16.303(a) ("A cost-sharing contract is a cost-reimbursement contract in which the contractor receives no fee and is reimbursed only for an agreed-upon portion of its allowable costs."); *id.* § 31.103(b)(1) (incorporating the cost principles and procedures as the basis for determining reimbursable costs under cost-reimbursement contracts). "In a cost-reimbursement contract, the

9

Government agrees to pay the contractor for all allocable and allowable costs incurred under the contract." *McDonnell Douglas Corp. v. United States*, 37 Fed. Cl. 295, 299 (1997), *modified on other grounds by* 39 Fed. Cl. 665, 665 (1997). "[T]he focus of a cost-reimbursement contract is contractor input, not output." *Id.*

In short, the grant agreements here could not have given rise to any expectation interest beyond reimbursement for costs actually incurred and approved pursuant to the cost regulations. Yet plaintiffs' damages theory would allow them to recover for costs they did not incur and costs that they have not submitted for reimbursement—which in no circumstance would be allowed under the governing grant agreements. Plaintiffs' theory would impermissibly place them "in a better position" than if the grant agreements had not been terminated, *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003), and would amount to "[m]ere speculation," *Willems*, 295 F.2d at 831.

### B.    Plaintiffs Cannot Establish the Damages They Claim

Applying the above principles leads to the inescapable conclusion that plaintiffs may not recover the damages they seek, rendering them unable to establish the requisite "fact of loss with certainty." *Willems*, 295 F.2d at 831. As noted above, while plaintiffs need not prove a specific quantum at this stage, they must prove entitlement to legally recoverable loss, *i.e.*, "fact of loss." *Id.*; *see supra* at 7-8 (citing additional cases).

1.    **Costs Due to Termination.** Plaintiffs cannot rely on claimed "costs … incurred as a result of the unlawful terminations," Mot. 39, for the simple reason that EPA has not refused to pay any such costs. Thus, this is a damages theory in search of a breach, leaving plaintiffs unable to recover this category of alleged damages.

EPA has consistently and repeatedly informed every plaintiff that "[c]osts incurred …

after this termination are allowable" pursuant to the regulations governing every grant agreement.  Appx176-177, Appx184-185; *see also, e.g.*, Appx192-194.  The termination amendments likewise reiterated that "[c]osts after termination are allowable if" they are allowable costs properly incurred before termination or are reasonable and necessary termination costs consistent with the regulations.  Appx181, Appx189.

Those regulations provide for "termination costs" that "would not have arisen had the Federal award not been terminated."  2 C.F.R. § 200.472(a); *see also id.* § 200.343. "[T]ermination costs" include "[c]laims under subawards" and "[i]f the [grantee] cannot discontinue certain costs immediately after the effective termination date, despite making all reasonable efforts."  2 C.F.R. § 200.472(a).  The regulations also provide for "closeout costs." Grantees "may charge the Federal award during the closeout for the necessary administrative costs of that Federal award," such as "salaries of personnel preparing final reports" and "publication and printing costs."  *Id.* § 200.472(b).

In other words, if plaintiffs actually incurred "termination costs" and costs from "lost staffing, paused contracts, [and] ongoing compliance expenses," Mot. 39-40, then they are entitled to submit those costs for reimbursement consistent with the regulations.  But unless a plaintiff does so *and* EPA refuses to pay termination and closeout costs due under the regulations, that plaintiff cannot establish breach of a duty to pay such costs, let alone resulting damage.  Nor can plaintiffs invoke anticipatory repudiation as their theory of breach, Mot. 31-32, when EPA has repeatedly made clear that it will reimburse termination and post-termination costs consistent with the regulations.  *See, e.g.*, *Tretchick v. Dep't of Transp.*, 109 F.3d 749, 752 (Fed. Cir. 1997) (requiring "a distinct unequivocal absolute refusal to perform the promise" (quoting *Dingley v. Oler*, 117 U.S. 490 (1886)).

11

Notably, plaintiffs have actively *resisted* submitting requests for closeout costs, going so far as to request preliminary injunctive relief from the district court. *State of Arizona, et al. v. EPA*, No. 2:25-cv-2015, ECF No. 64 (W.D. Wash. Nov. 14, 2025). The district court denied that relief five months ago, *id.*, ECF No. 119 (W.D. Wash. Jan. 13, 2026); and even so, to the present date, *23 plaintiffs* (out of 25) still have not submitted requests for closeout and termination costs. Appx197 ¶ 8; *see also, e.g.*, MD Decl. ¶ 20 (acknowledging EPA's April 2026 attempt to obtain closeout documents, with no indication of any response by Maryland); CT Decl. ¶ 19 (same, by Connecticut); NC Decl. ¶ 20 (same, by North Carolina). Virginia and Wisconsin are the only plaintiffs that have submitted closeout materials, and those materials are pending EPA's final review and action. Appx197 ¶ 8. Accordingly, any attempt by plaintiffs to claim breach and damages pertaining to closeout and termination costs is impermissibly "academic," *Cosmo*, 451 F.2d at 605, tantamount to a request for a prohibited advisory opinion, *see Arctic Corner, Inc. v. United States*, 845 F.2d 999, 1000 (Fed. Cir. 1988); *Stegall v. United States*, 19 Cl. Ct. 765, 773 (1990).

      2.      **"Potentially Increase[d]" Costs and Lost Opportunities.** For at least two reasons, the Court can also dispose of plaintiffs' two-sentence assertion of "potentially increase[d] overhead and labor costs," "lost opportunities for funding," and "lost energy savings." Mot. 40. To start, the regulations provide the outer limits of what any plaintiff could have expected to obtain from the grants, as discussed above. 2 C.F.R. Part 200, Subpart E. Any other principle would impermissibly place plaintiffs "in a better position through the award of damages" than if the grant agreements had not been terminated, contrary to the fundamental purpose of damages. *Bluebonnet*, 339 F.3d at 1345; *see White v. Delta Constr. Int'l, Inc. v. United States*, 285 F.3d 1040, 1043 (Fed. Cir. 2002). Plaintiffs identify no regulation under

12

which they could receive "potential" costs or "lost opportunity" costs—and we are aware of none. Quite the opposite: the regulations require costs to "[b]e adequately documented," 2 C.F.R. § 200.403(g); require costs to be "incurred," *e.g.*, *id.* §§ 200.100(c), 200.343, 200.403(h), 200.405(a); restrict drawdown to funds needed for "actual, immediate cash requirements," 31 C.F.R. § 205.33(a); and prohibit recovery for "[l]osses on other awards or contracts," 2 C.F.R. § 200.451.

Moreover, this category of plaintiffs' alleged damages is quintessentially speculative and therefore unrecoverable for this additional reason. *See Willems*, 295 F.2d at 831 (holding that "[m]ere speculation" does not suffice, even at the liability stage). "Contract law precludes recovery for speculative damages," and "remote and consequential damages are not recoverable in a common-law suit for breach of contract, especially in suits against the United States." *San Carlos Irrigation v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (cleaned up); *see also Lucas v. United States*, 25 Cl. Ct. 298, 311 (1992) ("Damages for lost business opportunities are not recoverable."); *Fields v. United States*, 147 Fed. Cl. 352, 357 (2020) ("The Court's award of any amount of damages based on Plaintiff's lost opportunity theory is speculative.").

Plaintiffs themselves admit the speculative nature of their claim by conceding that these costs are only "potential[]," and with no factual elaboration or support for hypothetical increased costs or lost opportunities. Mot. 40. Neither of the declarations plaintiffs rely on identifies any increased costs or lost opportunities that they experienced in the months since termination. *See* MD Decl.; AZ Decl. And in any event, the Court should not consider the declarations as evidence of damage when plaintiffs' counsel expressly disclaimed reliance on any materials beyond "the four corners of the contract" for their summary judgment motion, and when, as a result, the United States has had no opportunity to test these newfound assertions through

13

discovery.  ECF No. 52 at 6; *id.* at 14 (plaintiffs' counsel representing that no additional information is "necessary" because Count I "presents a pure question of law that is ripe for briefing at summary judgment"); *see also* ECF No. 60 at 19:20-22 (plaintiffs' counsel representing that their summary judgment motion will present "a legal question that will not resolve factual inquiries or discovery").  Plaintiffs' reliance on previously undisclosed, untested facts is antithetical to summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that summary judgment is inappropriate unless there is "adequate time for discovery"); *see also Estate of Blanco v. Prudential Ins. Co. of Am.*, 606 F.3d 399, 402 (7th Cir. 2010) (affirming exclusion of "new evidence" at summary judgment, including to "discourage[] sandbagging").

Plaintiffs' lone case, *Paul Hardeman, Inc. v. United States*, 186 Ct. Cl. 743 (1969) (cited at Mot. 40), does them no good.  In that case, the contractor had actually incurred increased costs, and the only question was whether those actual increased costs constituted "delay damages"—which the Court concluded they did not.  *Id.* at 748-49.  Plaintiffs here admit they have not incurred any such costs, which they label as "potential[]" only.  Mot. 40.

**3.    Value of the Grants.**  Plaintiffs' claim of damages "at least amounting to the difference between the sum promised and the sum received," Mot. 39, fails as well.  At bottom, plaintiffs' theory of recovery contravenes the incontrovertible cost-share structure of the grants, disregards the cost regulations undisputedly governing their receipt of funds under the grants, impermissibly places them in a better position than if the grants had continued, and relies on prohibited speculation.

*First*, the grant agreements are explicit: as explained above, EPA would cover the costs of only "approved" and "incurred" costs, "subject to applicable EPA regulatory and statutory

provisions," including the mandatory payment procedures in 31 C.F.R. Part 205. *See* Appx84, Appx87, Appx130, Appx133; EPA General Terms and Conditions at 4-5. Plaintiffs repeatedly admit this. Mot. 8, 28, 31-32. That cost-share structure permitted plaintiffs to request and withdraw Federal funds in accordance with the regulations and grant terms. *See* 31 C.F.R. § 205.2 ("draw down" means "a process in which a State *requests* and receives Federal funds" (emphasis added)); 2 C.F.R. § 200.305(a) (identifying the procedures under which "[p]ayments for States are governed").

Yet plaintiffs identify no costs approved and incurred for which they sought, but have been denied, reimbursement under the regulations. Nor could they: plaintiffs admit that they have already received the pre-termination costs they sought and state that, since termination, plaintiffs have "stopped implementing Solar for All." MD Decl. ¶¶ 13, 18, 22.[3] By definition, then, there are no other "approved" and "incurred" costs for which plaintiffs have requested, but not received, reimbursement under the cost-share structure of the grants. This defeats any claim for damages premised on an alleged failure to perform EPA's promise in the grant agreements. *See Hous. Auth. Slidell v. United States*, 149 Fed. Cl. 614, 626 (Fed. Cl. 2020) (cited by plaintiffs at Mot. 31, and noting that breach requires a "failure to pay money *when due and owing*" (emphasis added)).

Likewise, plaintiffs' theory of anticipatory repudiation as a basis for seeking the full value of their grants (Mot. 31-32) is incompatible with the cost-share structure of these grants,

---

[3] *See also* AZ Decl. ¶¶ 12, 20; CA Decl. ¶ 17; CO Decl. ¶¶ 15, 20, 24; CT Decl. ¶¶ 13, 21; DC Decl. ¶¶ 12, 19; HI Decl. ¶¶ 14, 21; IL Decl. ¶ 16; KY Decl. ¶ 13; ME Decl. ¶¶ 13, 20; MA Decl. ¶ 13; MI Decl. ¶¶ 13, 19, 21; MN Decl. ¶¶ 13, 16, 20; NV Decl. ¶ 11; NJ Decl. ¶¶ 13, 17; NM Decl. ¶¶ 13, 21; NY Decl. ¶¶ 12, 18; NC Decl. ¶ 13; OR Decl. ¶¶ 14, 19; ECF No. 72-20 (PA Decl.) (identifying no submission of incurred costs); RI Decl. ¶ 13; VT Decl. ¶ 13; WA Decl. ¶ 13; WI Decl. ¶ 13; VA Decl. ¶¶ 13, 16.

which require costs to be both "approved" and "incurred" to qualify for EPA's reimbursement—not hypothetical future costs not yet incurred.  The sole case plaintiffs cite in support, *Doe v. United States*, 153 Fed. Cl. 629 (2021) (cited at Mot. 20, 29), does not support their theory.  In *Doe*, the plaintiff was a whistleblower who had already performed his end of the alleged contract with the Internal Revenue Service (IRS), under which the IRS would pay a preliminary amount as well as an additional amount following a "final determination."  *Id.* at 639.  The IRS paid the preliminary amount but allegedly repudiated its future duty to pay the final amount.  *Id.* at 634-35.  On a motion to dismiss, the court "[a]ssumed these allegations are true"[4] and held that the plaintiff's breach claim was ripe even though the IRS's time for performance on the final amount had not yet arrived.  *Id.* at 639.  *Doe* said nothing about damages, much less that a plaintiff can obtain as damages the hypothetical future costs it would have incurred if the plaintiff had continued to perform its obligations under the contract.

Indeed, plaintiffs' repudiation theory is inconsistent with the well-settled duty to mitigate damages and *avoid* loss upon receipt of the termination notice.  *Robinson v. United States*, 305 F.3d 1330, 1333 (Fed. Cir. 2002) ("a party cannot recover damages for loss that he could have avoided by reasonable efforts").  Even if a party has repudiated a contract, "[t]he injured party generally will not be awarded damages for any part of the loss that the injured party could have avoided by discontinuing performance."  Williston on Contracts (4th ed.) § 63:44.  "To take an obvious case, the builder who stubbornly continues work after the owner has repudiated the contract cannot recover for expenditures in doing work after the repudiation."  Farnsworth on Contracts (4th ed.) § 12.08; *see also, e.g.*, *Rockingham Cnty. v. Luten Bridge Co.*, 35 F.2d 301,

---

[4] The summary judgment standard requires the opposite of a motion to dismiss: it requires evidence, viewed in the light most favorable to the non-moving party—here, the United States.

307 (4th Cir. 1929) ("after an absolute repudiation or refusal to perform by one party to a contract, the other party cannot continue to perform and recover damages based on full performance"). Plaintiffs' effort to recover avoided future costs as their damages gets the analysis exactly backwards. Avoided costs are a basis for *reducing* a damages claim, not for establishing an affirmative damages claim. *See White*, 285 F.3d at 1043; Restatement (Second) of Contracts § 347 ("This cost avoided is subtracted from the loss in value caused by the breach in calculating [] damages.").

*Second*, again, the grant agreements provided that EPA would cost-share only approved and incurred costs, bounded always by the regulations governing every grant agreement. 2 C.F.R. Part 200, Subpart E. As a result, plaintiffs cannot claim any expectation of an unqualified commitment to provide the entire value of the grant. Costs would need to have been among those "approved" by EPA, "incurred" by the grantee to be submitted for reimbursement, and assessed pursuant to the regulations. *Id.*; *see also* Appx106 ("All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500."); Appx126 (providing that EPA will "[v]erify[] that the Recipient is expending the award on allowable activities" and "[p]eriodically review[] costs incurred by the Recipient … to ensure appropriate expenditure of grant funds"); Appx152, Appx171 (same).

Plaintiffs cannot prove (and have made no effort to prove) a but-for world in which they would have been reimbursed for hypothetical future incurred costs totaling the value of their grants. As detailed above, the regulations set strict parameters for what costs are "allowable," "reasonable," and "allocable." Moreover, any payments for costs that are determined unallowable "must be refunded with interest to" EPA. 2 C.F.R. § 200.410. Mandatory audits

17

performed annually during the life of the grant, for instance, may result in audit findings of "questioned costs" that result in a grantee being required "to repay disallowed costs." *Id.* §§ 200.504, 200.516, 200.521. Even after closeout of a grant, EPA is entitled "to disallow costs and recover funds on the basis of a later audit or review." *Id.* § 200.345(a)(1). And "any Federal funds paid to the [grantee] in excess of the amount to which the [grantee] is finally determined to be entitled under the terms of the Federal award constitute a debt to the Federal Government." *Id.* § 200.346. The cost regulations strictly govern "Federal awards," *id.* § 200.100(a)(1), and "must apply … in determining allowable costs under Federal awards," *id.* § 200.401(a).

It is therefore "[m]ere speculation" for plaintiffs to assume that they would have received the value of their grants irrespective of the regulations. *Willems*, 295 F.2d at 831. Any such assumption would also place plaintiffs "in a better position" than if the grant agreements had not been terminated—contravening the very purpose of damages. *Bluebonnet*, 339 F.3d at 1345; *see also White*, 285 F.3d at 1043 (even where the United States had breached an obligation to provide a plaintiff with a guaranteed amount of work, the plaintiff was not entitled to recover the full amount of the guarantee irrespective of costs it had incurred). In the but-for world, plaintiffs would have been limited to reimbursement for "approved" and "incurred" costs allowable under the regulations, and subject to disallowance and refund with interest to EPA. Plaintiffs' request here for nearly $2.9 billion in damages, free and clear of any such limitations, is flatly inconsistent with their expectation under the grant agreements and with binding precedent.

*Third*, plaintiffs' request for billions of dollars reflecting future costs they have not yet incurred effectively amounts to a request for EPA's specific performance of another four years of these grants, which this Court cannot award. *See Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 198 (Fed. Cir. 1997). To be sure, plaintiffs studiously avoid any reference to

18

specific performance and purport to seek monetary relief, and we are not asserting that this Court lacks jurisdiction over plaintiffs' claim. But the nature of the money plaintiffs seek as a remedy underscores why it cannot be the basis for plaintiffs' recovery of damages. The full value of what plaintiffs say they would have been entitled to under the grants if fully performed is not one that "compensat[es] for the losses, whatever they may be, that the State[s] will suffer or ha[ve] suffered" due to the grant terminations. *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988). Rather, the money plaintiffs seek is the "funds to which [the grants] allegedly entitle" them. *Id.* That is "specific relief," not to be confused with "an award of damages." *Id.* at 895, 901. Plaintiffs' desired pot of money "is not for presently due damages," *Lummi Tribe v. United States*, 870 F.3d 1313, 1319 (Fed. Cir. 2017), and reflects no consideration of mitigation and other "established principles about compensatory damages," *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1370 n.7 (Fed. Cir. 2021).

*Finally*, as the Court is aware, plaintiffs simultaneously pursued relief from a district court that would result in grant reinstatement. The district court has now adjudicated the parties' summary judgment motions and dismissed the case for lack of jurisdiction because the plaintiffs' claims "are contractual in nature" and belong exclusively "in the Court of Federal Claims"—as the Government has consistently maintained both in district court and here. *State of Arizona v. EPA*, No. 2:25-cv-2015, 2026 WL 1533001, at *1, 7 (W.D. Wash. June 1, 2026) (explaining that plaintiffs' requested relief "boils down to a retroactive reinstatement of their grants"). In the event plaintiffs appeal that decision (their time to appeal has not run), any such continued effort to seek grant reinstatement through those proceedings would make their claim here for the value of their grants speculative, at best, and an impermissible double recovery, at worst. *See Tex. Adv. Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1328 (Fed. Cir. 2018)

19

("[D]ouble recovery for the same injury is inappropriate."); *Crooker v. United States*, 828 F.3d 1357, 1363 (Fed. Cir. 2016) ("[I]t goes without saying that the courts can and should preclude double recovery by [a plaintiff].").

*    *    *

Given that plaintiffs have moved on liability only, it is sufficient at this stage to deny plaintiffs' motion for failing to establish liability by proving "with certainty" some recoverable damage. *Willems*, 295 F.2d at 831. The categories of damages they assert in their motion are not recoverable as a matter of law, and plaintiffs may not salvage their motion by attempting to identify new damages in their reply. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("An issue is waived unless a party raises it in its opening brief."). We intend to prove, at the appropriate stage in this case, that plaintiffs have in fact suffered no monetary damages from the termination of their grants. But any further assessment of actual damage would not be appropriate for resolution on a motion for summary judgment at the very outset of this action.

**CONCLUSION**

For these reasons, the Court should deny plaintiffs' motion for partial summary judgment.

20

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

GEOFFREY M. LONG
Assistant Director

OF COUNSEL:

<u>/s/ Catherine M. Yang</u>
CATHERINE M. YANG

Stephanie Rich
Jennifer Lin
U.S. Environmental Protection Agency

Trial Attorney
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-4336
Email: catherine.m.yang@usdoj.gov

June 22, 2026

Attorneys for Defendant

21